*In re* J.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. M.M. *et al.*, Respondents-Appellants).

Second District   No. 2—92—0737

Opinion filed May 20, 1993.

Jose M. Diokno, P.C., of Glen Ellyn (Jose Miguel Diokno, of counsel), for appellants.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Jeffrey B. Fawell, of Fawell & Fawell, of Wheaton, guardian *ad litem*.

JUSTICE BOWMAN delivered the opinion of the court:

Respondent parents, M.M. (adoptive father), and F.M. (adoptive mother), appeal from orders of the circuit court of Du Page County

(1) finding their adoptive child, respondent minor, J.M., neglected under the Juvenile Court Act of 1987 (Ill. Rev. Stat. 1991, ch. 37, par. 802—3), (2) appointing a guardian without the power to consent to adoption, and (3) requiring respondent parents to cooperate with any counselling program defined by J.M.'s caretaker including at least bimonthly visitation. The respondent parents assert on appeal that the trial court erred in (1) not entering an order requiring the State to prosecute a supplemental petition alleging J.M. dependent, (2) denying the respondent parents' section 2—619 (Ill. Rev. Stat. 1991, ch. 110, par. 2—619) motion to dismiss the State's petition alleging neglect, (3) finding J.M. a neglected child, (4) finding J.M. was not a dependent child, (5) appointing for J.M. a guardian without the power to consent to adoption, and (6) entering an order requiring the respondent parents to cooperate in a counselling program including bimonthly visitation at the institution where J.M. resides. We affirm.

On September 12, 1991, the State's Attorney for Du Page County filed a petition for adjudication of wardship on behalf of J.M., alleging that J.M. was a neglected minor in that his parents did not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his well-being, including adequate food, clothing and shelter in violation of section 2—3(1) of the Juvenile Court Act of 1987 (the Act) (Ill. Rev. Stat. 1991, ch. 37, par. 802—3(1)). J.M.'s adoptive parents were named as respondents on the petition. Department of Children and Family Services (DCFS) was authorized to find suitable placement for J.M. Ultimately, J.M. was placed at a children's hospital in Urbana. The trial court appointed a guardian *ad litem* to represent the minor. On October 2, 1991, respondent parents moved for leave to file a supplemental petition alleging that J.M. was a dependent minor as defined by section 2—4(d)(1) of the Act. This petition alleged that the respondent parents wished to be relieved of all residual parental rights and responsibilities, guardianship and custody over the minor, and had "good cause" for their wish to be so relieved. Ill. Rev. Stat. 1991, ch. 37, par. 802—4(1)(d).

Hearings on those two petitions were held. Respondent parents filed a motion to dismiss the neglect petition on the basis that the claim asserted against the parents was barred by affirmative matter as set forth in affidavits pursuant to section 2—619(a)(9) of the Civil Practice Law. (Ill. Rev. Stat. 1991, ch. 110, par. 2—619(a)(9).) That motion was denied. In addressing the merits of the petitions, the trial court decided first to hear testimony on the neglect petition, and then

to hear testimony on the dependency petition, although the court acknowledged that some of the evidence that would be presented would apply to both petitions. Regarding the neglect petition, the State called the father as a witness, while respondent parents introduced the testimony of a child psychiatrist and two principals of the schools that J.M. attended while living with respondent parents. As regards the dependency petition, the State put on a caseworker from Catholic Charities, while respondent parents called a caseworker from DCFS, and then both parents testified themselves. The testimony revealed the following facts.

Respondent parents were residents of Wheaton and had one natural son of their own, G.M., who was 11 years old at the time of the hearing. In 1989 they discussed adopting another child. Respondent parents were in contact with Catholic Charities about adopting a child close in age to G.M. Since they were interested in a child older than four years old, it would be termed a special-needs adoption. Through their Catholic Charities contact, they became aware that J.M. was nine years old, a candidate for adoption and was located in a foster home in Decatur. DCFS provided a history of J.M.'s family so that the respondent parents could become familiar with the case. Respondent parents were made aware that J.M.'s biological mother neglected him, his mother's paramours abused him, and he had been in several foster homes. J.M. had a history of not sustaining good relationships with women and with children his age and seemed only to bond well with adult males. Respondent parents indicated that they would like to meet J.M., and so a meeting was set up at the DCFS office in Decatur in October 1989. The interaction between J.M. and the M. family was positive, so the visits continued. While respondent parents felt that there were some minor problems in J.M.'s behavior and habits, they felt that with time he could adapt to their family. Eventually, J.M. moved into the respondent parents' home early in November 1989. No adoption had been finalized because an adoption may be finalized only after a six-month period of having the child in the home.

Prior to J.M.'s moving in with them, respondent parents participated in a full-day seminar on adopting special-needs children. J.M. had been previously diagnosed as having attention-deficit disorder and was taking Ritalin when he moved into respondent parents' home. Without consulting a physician, although at the suggestion of a social worker, respondent parents took him off the medication. J.M. had been getting counselling prior to moving in with them, but on the recommendation of a social worker at the Decatur Mental Health Hospital, respondent parents decided not to send him to a counselor since

he would have so many new things to adjust to in his move to Wheaton. Prior to his moving in with them, the adoptive mother contacted the principal of the school J.M. would attend and arranged for J.M. to get special education at the school. She made sure he had an individual education program (IEP) which would permit him to be taken into the special education program at the school. The respondent parents were interested in how J.M. did at the school and were cooperative with the school. In March 1990, the school psychologist did an evaluation of J.M. which was later used for an annual review done by a committee at the school. The respondent parents were made aware of the results of the evaluation. The evaluation revealed perceptual disability, confusion, and impulsivity. Furthermore, J.M. had achievement scores far below his age-appropriate level of functioning. The evaluation also revealed that J.M. had an attention-deficit disorder and social behavioral difficulties. The school suggested that J.M. should see a neurologist. Although they could not contact a neurologist who participated with the Department of Public Aid (DPA) in the Wheaton area, the respondent parents did take J.M. to a neurologist at their own expense and complied with her recommendations. It was decided at the annual review that J.M. should be transferred to a school which had a more appropriate special education program for him.

Respondent parents had been spending a substantial amount of time with J.M. He had to be taught how to bathe himself and how to groom himself. Respondent parents also taught him how to tell time, how to tie his shoes, and how to ride a bicycle. His adoptive mother spent at least a couple of hours each day helping him with homework, math, or reading. There were times J.M. and G.M. got along and played as brothers for hours, and other times that they did not get along. J.M. had problems getting along with his peers; he would try to hold hands with his peers or hug them, as he sought approval, and this alienated other children. At times, he was very withdrawn and would stay in his room. At this time, he seemed to respond to both parents. Respondent parents seemed to think any problems he was having were "adjustment" problems due to all the recent changes in his life.

Respondent parents secured a judgment of adoption of J.M. on May 4, 1990, in Cook County. Respondent parents had an agreement with the State that services for J.M. would be available through DPA. During the summer of 1990, J.M. attended a special education summer program for half-day sessions during one month of the summer. The remainder of the summer, he participated in another academic

program which consisted of one-hour sessions, five days a week. He was showing progress in his reading level and math acumen from the time when he first moved in with the M. family. His adoptive father indicated that he thought that J.M. was adjusting to life with his new family.

The family took vacations together. For Christmas 1989, all four of the M.'s went for two weeks to New Orleans to visit family, an annual trip made by the M. family. J.M. was welcomed by his extended family, got plenty of gifts, and seemed to enjoy meeting everyone. In the summer of 1990, the family flew to Florida and went to Disney World for a week. There, J.M. presented some minor disciplinary problems. Around that time, it was becoming evident that J.M. was more interested in talking to his adoptive father than to his adoptive brother or adoptive mother.

For the school year 1990-1991, J.M. started at a different public school which had a special education program more suited to his needs. At that time, J.M. was getting more "aggressive" with respect to other children and more obstinate about doing his homework. J.M. refused to do his homework. After consulting his pediatrician and teacher, respondent parents complied with the teacher's recommendations about how to encourage modifications in his behavior. The family went to New Orleans for Christmas 1990. At that time, it was evident that discipline was becoming more of a problem with J.M. During the trip to New Orleans in the family van, he refused to go to the bathroom during rest stops and subsequently urinated all over himself in the van. This was the first incident in a pattern of incidents in which J.M. wet his pants and defecated in his pants which occurred in the beginning of 1991. During the first half of 1991, J.M. gradually verbally related progressively less to his adoptive mother. In June 1991, the adoptive father and G.M. went to Detroit for four days together on a business trip. On the second day while they were away, J.M. came out of his room, where he was spending most of his time, and informed his adoptive mother that he did not want to live in the M. house anymore, nor did he want to have the M. family as his family. He stated that he wanted to return to his biological mother in Decatur. While the adoptive father and G.M. were away, J.M. repeated these things several times to his adoptive mother.

In January 1991, when it became evident that J.M. was experiencing more behavioral problems, the adoptive father called the DCFS caseworker in Decatur to ask for services. She gave him a list of psychologists to call. Eventually, J.M. was referred to a neurologist in February. This neurologist suggested that J.M. be seen by a psychia-

trist. Instead of seeing J.M., the psychiatrist referred the family to a psychologist. The psychologist saw each member of the family once, and J.M. twice, and then recommended that J.M. have an extensive neurological and psychiatric examination at an adolescent medical facility. The M. family paid for these consultations as DPA did not cover visits to this neurologist or psychologist. The adoptive father called DCFS to find out if there was a DPA facility at which such an evaluation could be done. The evaluation was estimated to run from $3,000 to $4,000 per week for three to six weeks. At one point the M. family considered paying for the evaluation, although eventually the hospital bills were paid by DPA. Eventually, the adoptive father identified a hospital at which the evaluation could take place, made arrangements, and took J.M. there the first week of August 1991.

At the hospital, J.M. was in the primary care of the medical director of the adolescent psychiatric unit and was evaluated on a neurological and psychological basis. This doctor was the child psychiatrist who testified on behalf of respondent parents. She led a team of professionals who evaluated J.M. She prepared a discharge report which summarized the results from the neurological tests and the psychological tests. The evaluation led to the conclusion that J.M. was emotionally disturbed and was not neurologically or genetically disturbed. The opinion was that he had profound problems forming attachments to other people that would allow him to feel comfortable in age-appropriate situations. The recommendation was that he would be best served in an institutional setting until he was able to support himself, as there he would not identify with a parent who might let him down, as so many had done in the past. In such a setting, he would identify with the institution, and would not identify with a single person such as a parent who has other responsibilities and might have cause to turn his or her attention or affection away from J.M. The doctor met with the respondent parents several times through the three- to four-week evaluation. The recommendation as to institutionalization was communicated to the respondent parents during one of these sessions.

Before J.M. was admitted to the hospital, he had made it clear to respondent parents that he no longer wished to live with them. As a result of this, respondent parents consulted several agencies to try to resolve whether they could relinquish rights to J.M. to the State. They consulted DCFS, the College of Du Page Intervention Service, the Cook County public guardian's office and the Cook County public defender's office. The contact in the public defender's office suggested that they further discuss the situation. By that time, J.M. was undergoing evaluation at the hospital. The psychiatrist had already

suggested that J.M. not return to the M. home. The contact at the public defender's office got in contact with the State's Attorney's office, and together they arranged for there to be a hearing in which evidence would be presented. Respondent father testified that he anticipated that at this hearing the custody of J.M. would go back to the State, and the adoption would be vacated by Cook County.

The adoptive father related this development to the psychiatrist heading the team that was evaluating J.M. at the hospital. They set up a meeting between J.M. and the M. family to let him know he would not be coming back to live with them. It was the suggestion of the psychiatrist that they meet with him to say goodbye. The psychiatrist said that if arrangements could not be made to pick up J.M. by his release date, then she would notify DCFS to report that he was left at the hospital.

After that meeting, but before the court proceedings, the Cook County public defender's office informed the respondent parents that there would be no wardship proceeding in Cook County because the respondents were not residents of Cook County. The adoptive father contacted several agencies in Du Page County, and he testified that after relating the situation to someone in the probation office the recommendation was made that the respondent parents pick up J.M. at the hospital and abandon him at a police station. The respondent parents did not believe that such an action was appropriate, yet they had been told by the psychiatrist that it would be detrimental for J.M. and the rest of the family for them to pick him up at the hospital and bring him home after having said goodbye. So the respondent parents did not pick up J.M. from the hospital, and he was eventually taken into custody by DCFS. The Du Page County State's Attorney filed its petition alleging neglect on September 12, 1991. Respondent parents filed a supplemental petition alleging dependency on October 2, 1991. Hearings were held on the matter late in 1991 and early in 1992. On April 22, 1992, the trial court held that J.M. was a neglected child and was not a dependent child. On June 3, 1992, a guardian was appointed by the trial court, and the trial court ordered respondent parents to participate in counselling and visitation with J.M. J.M. is now in DCFS' custody and resides at a children's hospital in Urbana.

The first issue raised on appeal is whether the trial court erred in not ordering the State's Attorney to prosecute the respondent parents' supplemental petition alleging J.M. dependent. Before addressing the merits of that issue, we note that the State and the guardian *ad litem* argue that respondent parents' counsel waived this issue by his display to the trial court of his willingness to prosecute the peti-

tion. Respondent parents' counsel argues that he indicated a willingness to file the petition to the trial court and indicated a desire for the trial court to order the State's Attorney to prosecute the petition.

We have observed from the record that colloquies in the trial court on two occasions are pertinent to the waiver of this issue:

"MR. DIOKNO [counsel for respondent parents]: Judge, *** I have also filed *** the motion for leave to file a supplemental dependency petition or for an order directing the filing of prosecution of a dependency petition by Du Page County State's Attorney's Office, which I set for this morning's hearing also.

THE COURT: Leave granted to file it.
* * *

THE COURT: *** Now, let me ask you first, Mr. Collins, are you prepared to respond this morning to either of these?

MR. COLLINS [assistant State's Attorney]: Yes, your Honor. As to the motion that the State's Attorney prosecute a supplemental dependency petition, we would decline to do so.

THE COURT: Mr. Diokno, unless you have some case law to persuade me otherwise, I was going to say I would, in the alternative, of course grant you leave to file your supplemental *** dependency petition itself.

MR. DIOKNO: Judge, either way would be fine with us. We do have it prepared, a supplemental petition which is verified with supporting affidavits, which we could tender to the Court this morning as well as copies to the attorneys involved."

On the basis of that colloquy, the State and the guardian *ad litem* argue that the respondent parents' counsel agreed to prosecute the dependency petition and therefore the issue as to ordering the State's Attorney to prosecute the petition is waived. However, there is other discussion in the record that indicates the issue was not waived by the respondent parents' counsel. At a later hearing, the following colloquy occurred:

"THE COURT: I don't know whether I expressly ruled at some time, Mr. Diokno, orally on that part of the dependency petition, which asked that the State be obliged to prosecute. Maybe you can refresh my memory on that.

MR. DIOKNO: My interpretation of the case law with respect to an independent, so to speak, filing was that the Court could either direct the filing or the prosecution of a petition in Juvenile Court.

And it was based on my interpretation of the case law—

THE COURT: I agree with you, the Court can do that.

MR. DIOKNO: And I was just working from the interpretation of the statute that does allow a filing by any person other than the State's Attorney's Office.

THE COURT: However, at this time I'm denying that portion of the, I believe it was the motion for leave to file a dependency or supplementary petition. I'm denying that portion which asks that the State's Attorney's Office be directed to carry the burden to prosecute, of taking forward that petition."

On the basis of that colloquy, we determine that the respondent parents' counsel did indicate to the trial court that he wished the court to order the State to prosecute the dependency petition, and thus the issue was not waived by the counsel for respondent parents.

On appeal, respondent parents argue that the trial court erred in not ordering the Du Page County State's Attorney to prosecute the dependency petition. The State and the guardian *ad litem* argue that *People ex rel. Davis v. Vazquez* (1982), 92 Ill. 2d 132, and the other cases cited by respondent parents do not stand for the proposition that the trial court has the authority to order the State's Attorney to *prosecute* a petition filed under the Act. Ill. Rev. Stat. 1991, ch. 37, par. 801—1 *et seq.*

■ We first look to the statute for guidance as to the authority of the court to order the State's Attorney to prosecute a juvenile petition. Under the general provisions of the Act, we note that the statute identifies a general role for the State's Attorney: "The State's Attorneys of the several counties shall represent the people of the State of Illinois in proceedings under this Act in their respective counties." (Ill. Rev. Stat. 1991, ch. 37, par. 801—6.) However, the filing of petitions is not limited to the State's Attorney: "Any adult person, any agency or association by its representative may file, or the court on its own motion may direct the filing through the State's Attorney of a petition in respect of a minor under this Act." (Ill. Rev. Stat. 1991, ch. 37, par. 802—13(1).) Thus, it is clear that the court may order the State's Attorney to *file* a petition in respect of a minor under the Act.

According to *Vazquez*, the ordering of the State's Attorney to file a petition in respect of a minor is not an impermissible exercise by the judicial branch of powers belonging exclusively to the executive branch and thus does not violate article II, section 1, of the Illinois Constitution. (*Vazquez*, 92 Ill. 2d at 151.) Furthermore, the Illinois Appellate Court has extended *Vazquez* and held that a trial court has the power to order the State's Attorney to *prosecute* a petition under the Juvenile Court Act. *Sullivan v. Sullivan* (1982), 110 Ill. App. 3d 714, 720-21.

Thus, the trial court did have the power to order the State's Attorney to prosecute the dependency petition. Respondent parents argue that the trial court erred in *not* ordering the State's Attorney to prosecute the petition. We determine that no error occurred. This is because the action had been initiated by the State's Attorney's filing of the neglect petition. The State's Attorney had already taken the position that J.M. was a neglected child. Under these circumstances, the determination of J.M. as a neglected child or the determination of J.M. as a dependent child were mutually exclusive outcomes. Thus, it would have put the State's Attorney in a conflict of interest position to have to prosecute both petitions. We determine that it was not trial court error not to order the State's Attorney to prosecute the dependency petition.

The next issue on appeal is whether the trial court erred in denying the parents' motion to dismiss because the claim asserted against defendant is barred by affirmative matter avoiding the legal effect of the claim pursuant to section 2—619(a)(9). (Ill. Rev. Stat. 1991, ch. 110, par. 2—619(a)(9).) Respondent parents supported their motion by attaching affidavits from each adoptive parent. The State responds by questioning the applicability of a section 2—619 motion under the Act, since proceedings under the Act do not fit into the classic scheme of civil litigation between two parties. While cases dealing with section 2—619 motions in the context of the Act are not evident, we note that proceedings dealing with dependency and neglect under the Act are considered civil in nature. (*People v. Davis* (1973), 11 Ill. App. 3d 775, 778.) Furthermore, certain provisions of the Civil Practice Law are applicable to juvenile proceedings. (Ill. Rev. Stat. 1991, ch. 110, art. II; *Davis*, 11 Ill. App. 3d at 778.) Thus, we determine that a section 2—619 motion may be considered by the trial court under the Act.

■ However, we note that a section 2—619 motion to dismiss is analogous to a motion for summary judgment. The Historical and Practice Notes indicate that a motion to dismiss pursuant to section 2—619 is "a summary disposition of issues of law or of easily proved issues of fact, with a reservation of jury trial as to disputed questions of fact. *** This amounts to a summary judgment procedure on behalf of the defendant, or on behalf of the plaintiff." (Ill. Ann. Stat., ch. 110, par. 2—619, Historical & Practice Notes, at 662 (Smith-Hurd 1983).) A denial of a motion for summary judgment is not reviewable on appeal because the result of such denial merges with the trial that follows. (*Casson v. Nash* (1977), 54 Ill. App. 3d 783, *aff'd* (1978), 74 Ill. 2d 164.) Similarly, it is not proper to raise the denial of a section

2—619 motion on appeal, as the evidence was completely presented to the trier of fact during trial, and to overturn the judgment on less evidence, that is, in this case only affidavits, would be improper. (*Paulson v. Suson* (1981), 97 Ill. App. 3d 326, 328.) Therefore we need not address the issue of error in the trial court's denial of the section 2—619 motion.

Next, respondent parents contend that the trial court erred in determining that J.M. was a neglected child. They contend that they did all they could for J.M. They assert that they refused to pick him up from the hospital on the basis of the psychiatrist's opinion that, since he would no longer live with them, it would be in J.M.'s best interest to leave him at the hospital until he could be taken into DCFS' custody. The State and the guardian *ad litem* argue that clearly enough evidence was presented by the State to prove that J.M. was abandoned by his adoptive parents and they had vowed to no longer provide for him. The guardian *ad litem* posits that although the respondent parents may subjectively feel that their actions are in everyone's best interests, in Illinois, neglect encompasses both wilful and unintentional disregard for parental duties.

The Act provides, in pertinent part, that a neglected minor includes a person under 18 years of age

> "whose parent or other person responsible for the minor's welfare does not provide the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being, or other care necessary for his or her well-being, including adequate food, clothing and shelter, or who is abandoned by his or her parents or other person responsible for the minor's welfare." (Ill. Rev. Stat. 1991, ch. 37, par. 802—3(a).)

In general, "neglect" is considered to be the failure by a responsible adult to exercise the care that circumstances justly demand and encompasses both wilful and unintentional disregard of parental duty. (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 624.) The term is not one of "fixed and measured meaning" and takes its content from the specific circumstances of each case. (*Labrenz*, 411 Ill. at 624; *In re Stilley* (1977), 66 Ill. 2d 515, 520; *In re B.T.* (1990), 204 Ill. App. 3d 277, 280.) In dependency and neglect proceedings, both the State's Attorney and the court are charged with the duty of ensuring that at each step of the wardship adjudication process the best interests of the minor, the minor's family, and the community are served. (*In re J.J.* (1991), 142 Ill. 2d 1, 9; *In re A.F.* (1991), 234 Ill. App. 3d 1010, 1014.) Such proceedings are *sui generis*. (*In re B.T.*, 204 Ill. App. 3d

at 280.) The State has the burden of proving the neglect alleged in a wardship petition by a preponderance of the evidence. (*In re B.T.*, 204 Ill. App. 3d at 280.) The trial court's determination will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Stilley*, 66 Ill. 2d at 520; *In re S.D.* (1991), 220 Ill. App. 3d 498, 502; *In re B.T.*, 204 Ill. App. 3d at 280.

■ Based upon our review of the record, we conclude that the State's evidence was sufficient to prove that respondent parents neglected J.M. by failing to provide the proper care and support necessary for his well-being, and that they abandoned him. The State called respondent's adoptive father to testify as a State's witness. He testified that he did not pick up his son, J.M., from the hospital on his release date. He testified that in October 1991, after J.M. was placed in a foster home by DCFS, respondent father visited J.M. and brought him money for a haircut and some clothing. Since October 1991, the respondent parents have not brought J.M. clothing or money. Respondent father declared that they have no intention of providing shelter, clothing, food, education, medical or remedial care, or emotional support for J.M. in the future. In our view, this evidence was sufficient to prove the State's allegation that respondent parents neglected J.M. by failing to provide the care and support necessary for his welfare. Thus, the trial court was correct in finding J.M. to be a neglected minor.

Respondent parents argue that the trial court erred in rendering its decision on the neglect petition by asking the question of whether the dependency allegations override the neglect petition. We note that the trial court indicated some of its reasoning in the following colloquy:

"As for the initial and underlying petition by the State, I do find proven. And, in fact, I think, as I observed earlier, it is virtually uncontested as to the underlying facts on the neglect allegation. And the legal question all along has been whether or not, in effect, the dependency allegations could override it.

I do find then that the original petition has been proven. I do accordingly find the respondent minor, [J.M.], to be a neglected minor within the meaning of the Section 802—3 sub. 1, and there is an adjudication of wardship."

We may sustain the trial court's decision on any grounds in the record, regardless of whether the trial court relied on those grounds, and we do so sustain. *Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 502; *Schaumburg State Bank v. Bank of Wheaton* (1990), 197 Ill. App. 3d 713, 719.

Respondent parents next argue that the trial court erred in denying their supplemental petition alleging J.M. a dependent minor and that the record shows that they satisfied the "good cause" requirement of the statute. A trial court's determination on a dependency petition shall not be disturbed unless it is against the manifest weight of the evidence. (*Petition of Breger v. Seymour* (1966), 74 Ill. App. 2d 197, 202.) The pertinent portion of the Act defines a dependent minor as a person under 18 years of age

"(a) who is without a parent, guardian or legal custodian;

(b) who is without proper care because of the physical or mental disability of his parent, guardian or custodian; or

(c) who is without proper medical or other remedial care recognized under State law or other care necessary for his or her well being [*sic*] through no fault, neglect or lack of concern by his parents, guardian or custodian, provided that no order may be made terminating parental rights, nor may a minor be removed from the custody of his or her parents for longer than 6 months, pursuant to an adjudication as a dependent minor under this subsection (c); or

(d) who has a parent, guardian or legal custodian who with good cause wishes to be relieved of all residual parental rights and responsibilities, guardianship or custody, and who desires the appointment of a guardian of the person with power to consent to the adoption of the minor under Section 2—29." Ill. Rev. Stat. 1991, ch. 37, par. 802—4.

All parties correctly note that "good cause," under section 2—4(d) of the Act, has not yet been interpreted at the appellate court level, and thus each party puts forth its interpretation of what constitutes "good cause." Respondent parents assert that they were advised that it would be in J.M.'s best interest for him to live in an institutional setting, and thus they seek to relinquish all rights and responsibilities toward him with "good cause." The State argues that "good cause" should encompass an expression of good-faith performance and because the record shows that respondent parents did not show good faith in their care of J.M., "good cause" has not been demonstrated and J.M. cannot be adjudicated a dependent child under the statute. The guardian *ad litem* argues that respondent parents did not demonstrate "good cause" in their desire permanently to disavow themselves of the rights and responsibilities of caring for J.M. as there are less extreme measures such as the use of the "no-fault" dependency provision of the statute which would give them six months to be re-

lieved of the custody of J.M. Ill. Rev. Stat. 1991, ch. 37, par. 802—4(c).

■ Given that one of the purposes of the Act is "to preserve and strengthen the minor's family ties whenever possible," we determine that the language "good cause" in the context of relinquishing parental rights has a restricted application. (Ill. Rev. Stat. 1991, ch. 37, par. 801—2(1).) To construe "good cause" so as to allow a child to be turned over to the State child welfare system simply because he needed to be in residential placement for some time would not be consistent with the purposes of the Act. We agree that "good cause" should, in part, encompass an expression of good-faith effort.

If "good cause" encompasses an expression of good-faith effort, respondent parents have not consistently demonstrated that. Clearly, their conduct toward J.M. when he was living in their home was to be commended and was in good faith. The record reveals that they took the minor into their lives and gave him family nurturance and support. However, the respondent parents' actions revealed a change in attitude. The fact that they took a recommendation of extended institutional care for J.M. as an opportunity to try to relinquish all parental rights and responsibilities does not demonstrate good faith and cannot be condoned under the auspices of the Act. Thus, in this decision to abandon J.M., the respondent parents did not give the appearance of acting in good faith, and this undermines their claims of acting in J.M.'s best interest. Although not considered a factor in our analysis, the appearance of a change in their attitude is reinforced by their refusal to participate in counselling efforts with J.M. in institutional placement as discussed below. We determine that the respondent parents have not demonstrated that they are relinquishing their rights and responsibilities for "good cause." Thus, we determine that the trial court's determination that J.M. was not dependent under subsection 2—4(d) was not against the manifest weight of the evidence.

In their discussion of "good cause," both the guardian *ad litem* and the State's Attorney cite *In re A.F.* as an analogous case under the Act and to illustrate an alternative which respondent parents in this case did not pursue. *In re A.F.* concerned a 16-year-old who was emotionally disturbed and adjudicated dependent under the no-fault dependency provision. (Ill. Rev. Stat. 1989, ch. 37, par. 802—4(1)(c).) Under this provision, A.F. was to stay in a foster home in DCFS' custody for six months and then be returned to his parents' custody. His parents effectively abandoned him. (*In re A.F.*, 234 Ill. App. 3d at 1012.) The State and DCFS moved to vacate guardianship of A.F.,

terminate wardship, and return him to his parents' custody. The public guardian moved the trial court to direct the State to file a second petition for adjudication of wardship on the grounds of parental neglect. The trial court denied all of these motions. The public guardian appealed, arguing that the trial court should have directed the State to file a petition for adjudication of wardship on the grounds that A.F. was neglected and abandoned. The appellate court reversed, finding that, based upon A.F.'s parents' failure to maintain contact with him and their alleged lack of concern for his well-being, the trial court should have granted A.F.'s request to direct the State to file a petition for adjudication of wardship. (*In re A.F.*, 234 Ill. App. 3d at 1016.) While we agree that respondent parents in the present case could have pursued a dependency petition under the no-fault dependency provision as was done in *In re A.F.* (Ill. Rev. Stat. 1991, ch. 37, par. 802—4(1)(c)), we note that what they could have done is not at issue here. Furthermore, we believe that *In re A.F.* is not applicable to the "good cause" analysis here because no such analysis was made in that case.

The next issue raised by the respondent parents on appeal is the alleged error of the trial court in appointing for J.M. a guardian without the power to consent to adoption. The respondent parents contend that the court must consider (1) whether the parents voluntarily relinquish rights and responsibilities toward their child, and (2) whether it is in the best interest of the child to have a guardian with the power to consent to adoption appointed. The respondent parents assert that, in this case, it was made clear to the court that they willingly will give up their parental rights to J.M. Also, the expert testimony of the psychiatrist that was on the team that evaluated J.M. made it clear that it is in his best interest, the parents assert, that he never see them again. Furthermore, J.M. is now in contact with his biological brother at his residential placement, and respondent parents assert that for him to see them now would cause more emotional and psychological harm. Thus, the parents assert, the trial court's decision to deny their request to sever the familial relationship with J.M. is an abuse of discretion. Both the State and the guardian *ad litem* argue that the trial court's decision was no abuse of discretion as it is in J.M.'s best interest to appoint a guardian without the power to consent to adoption and such a decision is most consistent with the purposes of the Act.

Trial courts have been given wide discretion in determining the appropriate disposition in juvenile cases, and unless an abuse of discretion is demonstrated, the trial court's disposition should not be re-

versed. (*In re T.A.C.* (1985), 138 Ill. App. 3d 794, 798.) When construing the Act in concert with the Adoption Act, it is clear that when the child is a ward of the court, it is the order appointing the guardian with the power to consent to adoption that is the definitive act which terminates the rights of the parents. *In re M.M.* (1992), 226 Ill. App. 3d 202, 209-10.

■ We find respondent parents' position untenable. It is true that the psychiatrist who participated on the team which evaluated J.M. at the hospital told the respondent parents that after saying goodbye to J.M., it would be detrimental to them and to him to bring him back to their home. Yet nowhere in her testimony was there a statement that they should relinquish all ties with J.M. She recommended that he live in an institutional placement "that is family like, but not a family." Furthermore, the psychiatrist testified that the respondent parents told her prior to J.M.'s discharge date that they did not want him back in their house, and this bore on her opinion that J.M. should not be brought back to the M. home after saying goodbye. While that fact did not bear on her opinion about what was best for him, she had to address their unwillingness to take him back.

One of the underlying purposes of the Act is to strengthen family ties whenever possible. To terminate the rights of respondent parents at this point would have severed forever the ties between the M. family and J.M. We determine that the trial court did not abuse its discretion in not appointing a guardian with the power to consent to adoption.

Finally, respondent parents assert that the trial court erred in entering an order requiring the respondent parents to cooperate in a counselling program defined by the hospital in which J.M. now resides, including at least bimonthly visitations because it is not in J.M.'s best interest. Respondent parents assert again that, based upon the advice of the psychiatrist that evaluated J.M., they feel it would not be in his best interest for them to keep in contact with him. The State asserts that it is in his best interest for his adoptive family to keep in contact with him, and the guardian *ad litem* urges that the order for them to visit him and participate in counselling with him is consistent with the purposes of the Act.

We determine that it was not an abuse of discretion for the trial court to order such participation in counselling and visitation. The reasons that support this order are the same reasons that support the appointment of a guardian without the power to consent to adoption. To reiterate, such an order is consistent with the purposes of the Act. Furthermore, the psychiatrist did not urge that all family ties be sev-

ered between J.M. and his adoptive family. Thus, we affirm the trial court's order to the respondent parents to participate in counselling and to make bimonthly visits to J.M.

The orders of the trial court which have been discussed in this opinion are affirmed.

Affirmed.

McLAREN and COLWELL, JJ., concur.