NO. 4-06-0998       Filed 2/15/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: Z.L., a Minor, | ) | Appeal from |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Ford County |
| v. | ) | No. 06JA9 |
| JEFF L. and EMILY L., | ) | |
| Respondents-Appellants. | ) | Honorable |
| | ) | Stephen R. Pacey, |
| | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

In July 2006, the Ford County State's Attorney filed a petition for the adjudication of wardship of respondents Jeff L. and Emily L.'s minor child, Z.L. (born April 20, 1999). The trial court denied the petition for failure to show "good cause" to alleviate respondents from their parental responsibilities as required by section 2-4(d) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-4(d) (West 2006)). Respondents appeal, arguing they proved good cause. We agree with respondents and reverse and remand.

I. BACKGROUND

On July 19, 2006, the Ford County State's Attorney filed a petition for adjudication of wardship of Z.L. The petition alleged that Z.L. was a dependent minor pursuant to section 2-4(d) of the Act (705 ILCS 405/2-4(d) (West 2006)) because his parents, with good cause, wished to be relieved of

all residual parental rights and responsibilities and guardian-ship or custody. Respondents also desired a guardian be appointed with the power to consent to adoption.

Paragraph four alleged in support of "good cause" that Z.L. suffers from reactive attachment disorder (RAD) and had targeted other children in the home, causing one child to regress as a result of Z.L.'s conduct. Specific allegations in the petition included the following:

"(a) [Z.L.] sneaks into sibling's room and causes severe bruising to that sibling.

(b) [Z.L.] is urinating and defecating all over the residence.

(c) [Z.L.] has thrown a chair at an infant.

(d) [Z.L.] on numerous occasions, sneaking up behind his siblings and screaming in their ears."

Paragraph five alleged that respondents were in the position of being deemed neglectful to the other children in the home if Z.L. remained in their home. The petition alleged that due to Z.L.'s RAD, he was unable to "help himself from committing aggressive acts against anyone within his reach."

The trial court appointed a guardian ad litem (GAL), who filed a motion to dismiss the State's petition alleging the State had failed to allege facts sufficient to show "good cause." On July 27, 2006, the trial court denied the motion.

The GAL moved to admit documents into the record pursuant to Supreme Court Rule 216 (134 Ill. 2d R. 216). The first document was a checklist from Z.L.'s kindergarten teacher dated March 31, 2006. The checklist indicated the teacher had been acquainted with Z.L. for almost two years. It also indicated Z.L. was one to two years above his grade level. In an area to write additional comments, the report said, "no problems" followed by a hand-drawn smiley face. The report also indicated Z.L. "never" had behavior problems.

The second report was a teacher's report form dated April 5, 2006. It indicated Z.L. was "far above grade level." The report further stated:

> "[Z.L.] is a very hardworking student. He is well liked by all of his peers and teachers. [Z.L.] is the student that everyone wants to be with in a group or as a partner. *** [Z.L']'s work is very neat and clean. His seatwork is always above and beyond what is expected."

The report concluded with a review of Z.L's behavior that rated Z.L's behavior as high as possible in every single category. The report indicated that, at the request of Z.L.'s parents, he had repeated kindergarten and that Z.L. knew the curriculum because it was his second year in kindergarten.

On September 22, 2006, the trial court held a hearing on the State's petition. The court indicated at the beginning of

- 3 -

the hearing that Z.L.'s presence had been waived by the parties. Over the GAL's objection, the court allowed respondents' attorney to question witnesses during the hearing instead of the State's Attorney who had filed the petition.

Respondents first called Chris Cashen, a psycho-therapist at Carle Clinic (Carle) in Champaign-Urbana, to testify. After describing his education, experience, and background in counseling, all parties to this case acquiesced in Cashen being tendered as an expert.

Since February 2005, Cashen was part of Z.L.'s treatment team (which also included Dr. Charles Holly) that provided individual and family psycho-therapy to respondents and Z.L. Z.L. was six years old when Cashen began treating him. Cashen testified Z.L. has been diagnosed according to the Diagnostic and Statistical Manual, 4th edition (DSM IV), with RAD and bipolar disorder NOS (not otherwise specified). Cashen described RAD as a disorder of bonding. Characteristics of RAD include children who are unable to discriminate in terms of their social interactions with others. Cashen said that Z.L. had a number of symptoms characteristic of RAD. Z.L.'s primary symptom was "acting out." Z.L. deliberately urinated on the floor, on objects, in his bedroom, and other places in the house. Z.L. defecated on the floor, on objects, and on his bedroom floor, regardless of whether he was wearing a diaper or pull-up underwear. Cashen said, "He would urinate and defecate inappropriately; sometimes apparently very deliberately. It was highly unlikely to be

- 4 -

accidental." Cashen said Z.L. would throw himself on the floor and scream sometimes for as much as 45 minutes for no apparent reason. Z.L. would "shrink" from the affectionate touch of his parents. Z.L. frequently lied about mundane, unimportant matters. He would throw himself on the floor and scream, "Don't hurt me. Quit grabbing me. Quite [sic] choking me" even though no one was touching him.

Cashen made a note on May 25, 2006, that Z.L. would use a toy to bait his siblings to come closer, and then he hit, pinched, or pushed them. Z.L. also exhibited unusual food behaviors. He asked for one type of food, but when it was given to him he said he did not want it. Sometimes Z.L. refused to eat, and he learned how to vomit at the table "on demand." Cashen believes Z.L.'s vomiting at the table improved over time.

Cashen testified that RAD is very hard to treat and that several theories of treatment exist. Cashen testified that no one approach is scientifically demonstrated to be an effective treatment for RAD. One theory is regression therapy in which the child must be taken back to an earlier stage of development and "reattached." Cashen gave the example of a 10-year-old boy who was cradled like an infant and the parent then allowed him to express himself as an infant. Cashen said he is not familiar enough with regression therapy to recommend it.

Cashen said the treatment he chose was the cognitive behavioral approach. Cashen described this approach as trying to get Z.L. to "look at [his] world in an accurate *** way as

possible." Cashen said the theory is that if a person is looking at his life accurately, his emotional state will follow. Cashen said respondents were very cooperative in implementing Cashen's suggestions for Z.L.'s treatment. Respondents gave Z.L. timeouts for specific behaviors and specific amounts of time. Cashen said respondents were "very consistent" on their follow through. The theory behind using timeouts is that Z.L. would want to rejoin the family again when the timeout was over. However, Z.L. would go into a rage when he was placed in timeouts, and Cashen concluded timeouts were ineffective. Respondents also learned how to react to Z.L. when he was acting out. Cashen said that, at times, Z.L.'s behavior seemed to improve under this approach, but no "significant, positive impact" occurred over the course of treatment. Cashen testified that he met with Z.L. once every 2 to 3 weeks for 18 months.

Respondents' attorney had the teacher's report filed previously by the GAL entered into evidence as respondents' exhibit No. 2. Cashen agreed that the exhibit reflected that Z.L. was doing well in school when the report was made. Cashen said that usually a child with RAD will have difficulty in all settings, yet it was not unusual for a child with RAD to maintain himself in one setting and not another.

Cashen testified that if Z.L. had bonded with respondents at all, it was a "very tenuous and fragile" bond. He said that bonding is "one of the most, if not the most, fundamental aspects" of human relationships. Bonding creates feelings of

security and protection, especially in young children. Z.L.'s bond with respondents, according to Cashen, had dissipated over time. Cashen stated he had observed Emily with Z.L. and called her a "good mom" who appeared to love all her children. Cashen said it was important that Z.L. also form a bond with his siblings because it is another fundamental relationship group. Cashen said Z.L.'s bond with his siblings, if any, was more tenuous than Z.L.'s bond with his parents. Cashen said, "I don't believe there was a true bond there."

Cashen said that Z.L. purposely upset his younger sister, G.L. For example, he whispered to her that the family dog was dead and that their parents were lying to her when they told her the dog had been given away; or he told G.L. he was going to hurt her. Also, Z.L. stared at the other kids "not in the way that little kids get into a staring contest, but in a more intimidating way."

Cashen said, based on everything Z.L. has told him regarding his siblings, Z.L. did not have any feelings for them one way or another. During one session with Cashen, Z.L. indicated he wished to be an only child. Z.L. told Cashen that he loved respondents. Cashen testified though that he did not believe Z.L. had a bond with anyone in his family. Cashen said the probability of Z.L. having a successful life with respondents was "next to none." It was Cashen's opinion that Z.L. would do better in a household without other children, although Cashen admitted no research suggests whether children with RAD do better

- 7 -

in homes with or without other children.  Cashen said placement of Z.L. in a home without other children would be in his best interests.

Cashen did not believe Z.L.'s RAD was attributable in any way to respondents.  Cashen said the circumstances that cause RAD preexisted Z.L.'s involvement with this family.  Z.L. came to live with respondents in May 2001 when he was two years old. Cashen opined that respondents love Z.L. but had trouble liking him.  He believes Z.L.'s behaviors are causing self-loathing in respondents.  He said, "[respondents] are in an absolutely untenable situation.  The idea of giving up a child is just horrible I think to most of us.  It is horrible to [respondents], and I think they are in a circumstance [in] which they have a terrible choice and a worse one."

On cross-examination, Cashen said, "[RAD] is a diagnosis with a lot of severity and a lot of possible implications[;] and it is one of the diagnoses that we are reluctant to give unless we are absolutely sure that is the case."  The GAL asked Cashen if Z.L.'s tantrums posed any real type of harm to respondents or Z.L. other than embarrassment if they occurred in public.  Cashen answered "No."

Cashen said, "In this particular individual case, I think that it is possible that the removal of a sibling and/or the addition of a sibling may have exacerbated attachment issues. Although I do not believe there is a way to ascertain with any degree of certainty whether or not that actually is the case."

The GAL asked Cashen whether he had knowledge that persons at Baby Fold, a multiservice child-welfare agency in Normal, wanted to try regression therapy but that respondents refused. Cashen said he was unsure whether Baby Fold had recommended that therapy. Cashen said, "There is always another avenue. There is always another treatment for everything." Cashen testified he believed that the cognitive behavior technique he chose was "reasonable." Cashen agreed that some other treatment options that were not considered "totally off the wall" were available other than the cognitive behavior approach.

Cashen testified that Z.L. was on "some fairly serious prescription medication." Cashen had no knowledge of any research suggesting medication could exacerbate RAD. Cashen, however, was not the person prescribing Z.L. the medication.

Cashen reiterated that Z.L.'s bond with respondents was "tenuous at best" and that he did not believe respondents could have done anything differently to strengthen that bond. He said the bond between Z.L. and respondents has deteriorated to the point it does not exist. Cashen concluded, saying, "I cannot predict with any percentage or statistical likelihood" that Z.L. would do better in a household with no other children. However, Cashen said, "[G]iven that right now I see very, very little likelihood of any significant improvement, I believe that his best chance for success in life is going to be in another setting as an only child."

The trial court asked Cashen whether he could say with

a reasonable degree of professional certainty that it would be better for Z.L. to live in a household in which he is the only child. Cashen responded that if Z.L. remains with respondents "a very difficult situation is going to get worse." Cashen said with reasonable certainty that Z.L.'s best opportunity would be in a household with no other children.

The trial court then asked Cashen whether it was possible to diagnose RAD in Z.L. when he first came to live with respondents when he was two. Cashen said it would have been difficult because of the developmental characterization of a two-year-old, such as his or her inability to verbalize. However, Cashen said some characteristics of RAD may be apparent in a two-year-old child, but he would be reluctant to diagnose a two-year-old as having RAD. He said it is extremely difficult to diagnose a two-year-old with RAD to a reasonable degree of medical certainty. Cashen agreed with the trial judge that the Department of Children and Family Services (DCFS) had no way of knowing of Z.L.'s condition when respondents adopted him such as to forewarn respondents prior to the placement.

Cashen told the trial court that approximately 50% of his information in exhibit No. 1 came from sources other than his meetings with Z.L. and respondents. He said all of the sessions with Z.L., however, were one on one.

The trial court asked Cashen his opinion of the teacher's evaluation form of Z.L. submitted into evidence by the GAL. Cashen said that it was "unusual grading for a lot of

- 10 -

children[;] I would be surprised that the average child would be regarded as quite literally perfect." The court recognized that the report ranked Z.L. high above grade level, hard working, neat, clean, with the absence of any negative behaviors. The court agreed this was an "unusual" evaluation.

Cashen testified that the Z.L.'s medication was to treat his bipolar disorder as there was not a recommended psycho-pharmological treatment for RAD.

Kim Higgins testified next for the State. She is an adoption-preservation therapist at Baby Fold. The State tendered Higgins as an expert without objection. Higgins is an attachment and trauma therapist. She helps adopted families attach to their adopted child and helps the adopted child attach to his adopted family. She also connects families to resources and services as needed.

Higgins testified that adoptions fail when families are not prepared in advance, lack resources to get the treatment that the children need, lack financial resources, or lack community resources. She also said that often, in her experience, adoptions fail when adopted children are diagnosed with RAD. Higgins said her case load primarily consists of children diagnosed with RAD. She said it was the toughest issue she deals with as an adoption-preservation specialist. Although she has seen a fair number of children with RAD, Higgins said it is "very rare" in the general population. According to Higgins, "[RAD] is an emotional disorder involved with the first two years of life.

[Children] were not able to attach to a healthy caregiver, and because of that, they have an inability to attach to healthy caregivers after that, which results in them having extreme behavioral and emotional problems as a way of resisting that attachment to their parents."

Higgins testified that she met with Z.L. in person and reviewed some records in an attempt to help respondents. Respondents provided her with all the history and documents they had received from DCFS. Higgins testified that she was familiar with DCFS records and that Z.L.'s records lacked historical information about his placement in foster care, particularly information about the caregivers. Z.L. never lived with his biological parents. He was removed at birth due to his brother's removal for physical abuse.

Higgins testified that the type of care a child receives during his first two years of life is the primary factor in determining whether a child has an attachment disorder. If a child receives intermittent and inconsistent care, rather than continuous and consistent care, the child will be more likely to develop RAD. Another factor is whether the child had multiple caregivers in the first two years of life, in which the child became attached to people who came and went. Also, other factors include whether the child's needs were neglected and whether the child was subject to any form of abuse, either physical, verbal, sexual, or emotional. Higgins testified that respondent Emily told Higgins that Z.L. was placed in a foster home where the

mother was obese and unable to physically care for the children so three shifts of caregivers came into the home. One came during the day, another at night, and another on the weekend. The foster mother's role was to supervise the caregivers. Z.L. lived in this home from birth until he was two.

Higgins testified that this scenario was important to Z.L.'s diagnosis because the primary purpose of a child from birth to two is to attach to someone and to learn about himself through that attachment. If there are multiple caregivers, Higgins said, the child learns he can trust and attach to no one. Therefore, according to Higgins, the child becomes defective in his attempts.

Higgins says that she tries to treat children with RAD, but the disorder is difficult to treat. She agreed that "even good parents" are not always successful at treating children with RAD. Higgins described attachment therapy. One form of attachment therapy is play therapy, where the children are playing and, thus, their anxiety level is low. This allows parents the opportunity to do attachment work such as make eye contact and touch the children when the children are not defensive. Other therapy work is talk therapy, where the therapist holds the child in her lap and talks to him. Higgins said attachment between the child and therapist is encouraged because it is easier for the child to attach to an outside person. Once the therapist gains the child's trust and attachment, the therapist can transfer that to the child's parents.

Higgins said she encourages families to use time-ins as a form of discipline rather than time-outs. During a time-in, the child has to stay with the parent, preferably touching the parent by holding the child's hand. Higgins said children with RAD have lengthy tantrums and rages that can range from 30 minutes to 2 hours. During these tantrums and rages, Higgins encourages parents to stay with their child because children are trying to push parents away through their misbehavior. By staying with children during their tantrums, it sends the message to the child that the parent will be there for him regardless of his misbehavior.

Higgins said attachment therapy is different from cognitive behavioral therapy. Higgins said attachment therapy and cognitive behavioral therapy are the two major forms of therapy accepted by therapists as ways to treat children with RAD. Higgins said that only between 20% and 25% of children with RAD will improve with any form of therapy.

Higgins testified that if an adoption fails due to RAD, the options become a residential treatment center or a foster family. A residential treatment center is a 24-hour living situation for children with RAD where they receive services by trained staff, receive intensive therapy, and sometimes attend a school that specializes in children with behavioral disorders. However, without an individual-care grant, Higgins said the cost of residential treatment is cost prohibitive. Higgins said the last known figure she knew was that it cost $800 per day and the

average length of treatment was between 18 and 24 months. To get an individual-care grant, the child must be diagnosed with some form of psychosis-schizophrenia or bipolar with psychosis. Because Z.L. does not have either diagnosis, he does not qualify for a grant. The trial court asked Higgins whether Z.L.'s diagnosis of bipolar NOS (not otherwise specified) caused him to be ineligible for the grant. Higgins said Z.L. was ineligible because his form of bipolar is not bipolar with psychosis.

Higgins said that in her experience, children with RAD experience more behavior problems when therapy begins before they get better. Higgins said that when other children are in the home, therapy is only going to work if there are several support- ive people around. This is because a child with RAD needs individual attention. If respondent Emily were to participate in RAD therapy for Z.L., it would take her completely out of the lives of her other children, some who were younger than two, and put those children at risk of developing RAD.

Higgins testified that she was aware respondents previously had another child in their home named A.L. A.L. was Z.L.'s older brother. Someone else at Baby Fold provided respon- dents with assistance with A.L. When A.L. and Z.L. were placed with respondents, Emily was confined to bedrest due to complica- tions with her pregnancy. Higgins said it was "unusual" to take the children out of a seemingly stable environment and place them with a mom who is in the hospital and on bedrest. Higgins said that she did not understand why DCFS did not wait until Emily

returned home to place A.L. and Z.L. in her home.

Higgins did not work with A.L., but she did review his records.  Higgins said A.L. had "severe behavioral issues."  He was violent toward Emily's baby, G.L.  He had thoughts of harming G.L and pinching G.L.  A.L. was smearing feces, breaking things, and urinating all over the house.  He actively resisted any control by respondents and abused Z.L.

Higgins said respondents sought out services to help A.L.  They had A.L. psychologically assessed.  Respondents went to RAD specialist Cheryl Palanski.  Respondents took A.L. to day treatment at the Pavilion.  He also received psychotropic medications.

Higgins reviewed respondents' exhibit No. 2, the school records submitted by the GAL.  Higgins said it was not unusual for children with RAD to behave well in school because a teacher was not necessarily someone to whom a child needed to attach.  Also, she said, children with RAD work well in highly structured environments and manipulate teachers into getting their needs met because they do not have to bond with the teacher.  It also happens that children go to psychiatric hospitals and are sent home because they do not exhibit any symptoms, but then they go home and hurt someone that same day.

Higgins said that based on her review of the records, Z.L. had not bonded with anyone in respondents' family.  Higgins said that typically with attachment therapy:

"There is oftentimes a huge increase in

- 16 -

behaviors.  The whole reason they are not attaching is because their fear, this core belief that they have about themselves that they are not good, that they caused people not to take good care of them in historical terms.  And so, they, they believe[,] they have a belief, a distorted belief that if they do not attach to somebody and they don't allow that person to attach[,] we start to force that attachment to happen, they have increased behaviors and increase the problems to push the parents away, to keep them from attaching to them because of that intense fear that they have.

* * *

[Children with RAD act out because of] this misguided belief that, if they can sort of control their parents' being angry with them, and control their parents not having loving feelings toward them, they will be in control of what bad things happen to them or not."

On cross-examination, Higgins testified that if Z.L. is removed from respondents' home it would reinforce his feelings that he cannot bond with someone, but it would not <u>cause</u> those feelings in Z.L. because those feelings formed before he was two

- 17 -

years old.

Respondent mother, Emily, testified that she lived in Gibson City and was a stay-at-home mom. Her husband, respondent father, Jeff, is a firefighter in Champaign. They have four children: Z.L, seven years old; G.L., five years old; R.L., two years old; and F.L., nine months old. DCFS licensed Emily and Jeff to be foster parents after conducting home visits, background checks, and requiring Emily and Jeff to complete classes. Emily said she and Jeff intended to incorporate an adopted child into their family, as well as have biological children of their own. Emily said she was pregnant with G.L. when she received a call from DCFS that they would be foster parents. A few weeks later, Emily was hospitalized and confined to bed rest. Emily was hospitalized nine weeks and two days. After G.L.'s birth, G.L. remained in the hospital six weeks. During this time A.L. and Z.L. were placed with Emily and Jeff.

DCFS told Emily and Jeff that A.L. had been taken into foster care and that both he and Z.L. had been in the same foster home the entire time they were in DCFS's care. Emily said DCFS told her they were beautiful boys, perfectly normal, and they would fit in wonderfully in Emily and Jeff's home. Emily could not recall whether DCFS told her anything about the boys' previous foster home other than they could no longer stay there because parental rights had been terminated. Emily could not recall if they were told anything regarding the length of time the boys had been in that home. Emily said that DCFS may have

informed them of the previous foster's mom's declining health, but most of the information she and Jeff obtained came from their personal visit to the boys' previous foster home.

Emily testified that the placement, at first, was fine. A.L. seemed to love Emily and Jeff from the first minute he arrived. She said he was "estatic [sic], and all over us." She said Z.L. seemed ambivalent. Emily said, "We often said he seemed to blend in like wallpaper, that there just wasn't any-thing that would stand out necessarily."

Emily said that when her mother was watching the children during the time Emily was in the hospital, her mother told her there were problems, but her mother was unsure exactly what was wrong with them. Emily decided to wait until she was home to interact with the children herself to see if they needed services. The problems were initially only with A.L. Emily informed DCFS about these problems, and DCFS informed her that the doctors and treatment she needed could only be provided through the State insurance plan, which was not effective until the adoptions were complete.

Emily was home approximately 10 weeks when the adoption took place. Immediately after the adoptions, A.L. began exhibit-ing behaviors such as dominating Z.L., frequently hurting Z.L., tackling Z.L., urinating in Z.L.'s mouth and on Z.L.'s bed, putting feces in Z.L.'s mouth, smearing feces on the wall, and pinching G.L. hard enough to make her bleed. A.L. pushed Emily down the stairs more than once, tried to stab her with a screw he

got from taking his dresser apart, broke things continuously, and screamed when Emily or Jeff tried to discipline him.  Emily said A.L. disassociated to the point his eyes glazed over.  She said he masturbated continuously and with objects.  Emily said, "[A.L.] tried to hump [G.L.'s] face when she was an infant on more than one occasion."

Emily took A.L. to Dr. Levy.  A.L. received inpatient treatment at Pavilion, where he was eventually diagnosed with RAD.  Emily said that A.L.'s treatment included medication, attachment therapy through Baby Fold, and  treatment from Cheryl Polanski, a RAD specialist.

The treatment at Baby Fold did not work, and A.L. became much worse.  In one session with Polansiki, she recorded A.L.'s plan to slice G.L.'s throat from one side to the other. A.L. demonstrated this on a doll and said how he was going to wash the blood.  He said he knew where the knives were, and he knew he had to wait until she and Jeff were not around.

A.L. and Z.L. had been in their home since the end of May 2001, and on February 14, 2003, Emily and Jeff sought to end the adoption.

Emily said during the time the adoption termination of A.L. was underway, Z.L. continued to be withdrawn.  Emily said she believed it was because of A.L.'s dominance and aggression toward him.  Emily said that she hoped that with A.L.'s removal, Z.L. would feel safe and begin to develop a personality.  Emily agreed that the motivation to end the adoption of A.L. was to

- 20 -

keep both G.L. and Z.L. safe.

Emily stated once A.L. left, Z.L. did not stabilize; but at first, she and Jeff were excited about this because they thought it was Z.L. developing a personality. Emily said, however, once Z.L. began exhibiting a slow progression of behaviors they were determined that it was not RAD and that things were fine. She said she and Jeff had Z.L. seeing doctors and working with therapists. When Z.L. first started exhibiting behaviors indicative of RAD, they took him to see Ann Crumpler at Baby Fold. Then they took him to see a psychiatrist, Dr. Beck. She said they saw Dr. Beck regularly until the Provena Covenant Mental Health Center closed, and at that point they switched to Carle. They started there with Dr. Charles Holly. Emily said she and Jeff were told Dr. Holly was very good. Then they went to see Tom Shannon, a behavioral psychologist recommended by Dr. Holly. Shannon, however, told Emily and Jeff that he did not believe Z.L. would get any better. Unhappy with that comment, Emily and Jeff took Z.L. to see Cashen. Cashen is a colleague of both Dr. Holly and Shannon.

Emily testified that they cooperated with Dr. Beck and Dr. Holly. Emily said over the course of treatment with Dr. Holly, Z.L. was on approximately 10 different medications. At Shannon's suggestion, Emily and Jeff tried 1-2-3 Magic, a program of behavior modification without corporal punishment. The program did not work with Z.L. Emily said, if anything, Z.L. became worse. She said he resisted any discipline and instead

screamed, threw a fit, growled, and stomped.  Emily said Cashen suggested several alternatives to 1-2-3 Magic, but she did not recall attachment therapy as being one of them.  Emily said they had tried attachment therapy with A.L., and it did not work, so they wanted to try something different with Z.L.

In February 2005, they began seeing Cashen.  Emily was pregnant with R.L. at the time.  She said she was cooperative with his suggestions.  Some of those suggestions were different lengths of time-outs, only giving Z.L. six to seven time-outs before he had to go up to his room until the next meal, and having Z.L. articulate what he had done wrong and how he could improve next time.  Emily said the hope with the time-outs was that Z.L. would want to rejoin the family and create a bond.  However, Z.L. articulated to Emily and Cashen that he preferred to stay in his room.  None of Cashen's suggestions worked.

Emily said the most problematic of Z.L.'s behaviors was the continuous fits of rage in which Z.L. screamed for hours and only take breaks from exhaustion.  Emily characterized them as "blood[-]curdling screams."  Z.L. screamed that Emily and Jeff were hurting him and he beat his head against the wall.  He also hurt the other children.  Emily said that when Z.L. did so, he seemed to feel "justified in it and doesn't see anything wrong with it and does not want to stop, and he tells you he will hurt them."

Emily said that Z.L. had hurt G.L., the next oldest child during the game of "Red Light, Green Light."  Z.L. appar-

ently had told her to stop, and she did not. Then, Z.L. took a broomstick and knocked her off her bike and onto the concrete. As a result, she had a bump on her head. When G.L. came inside to tell Emily what happened, Z.L.'s only response was that she did not stop when he told her to stop. Emily said Z.L. had hit G.L. on multiple occasions. He walked up to her while she was watching cartoons and punched her in the face.

Emily said Z.L. had different behavior cycles that changed every four to six weeks and that "we revisit them at different times throughout the year." Z.L. went seven or eight days hitting G.L. every day; he had hit other children that came over to the house, as well as those at school.

Emily testified Z.L. has also hurt her next oldest child, R.L. Z.L. put his face in R.L.'s and growled and stared him down at meals. Z.L. sneaked up behind R.L. and screamed at him. Emily said Z.L. sneaked into R.L.'s room and punched him hard enough to leave bruises on R.L.'s legs. Z.L. tried to bait R.L. closer with a toy and then hit R.L.

Emily said Z.L. twice tried to hurt her youngest child, F.L. Once, on Easter, Emily's mother and grandmother observed Z.L. walk up to F.L. and grab her on the foot and begin squeezing. Second, he threw a chair at F.L. while she was in the playpen. The chair bounced off the playpen and onto the floor.

In response to the GAL's exhibit No. 2, the teacher's report, Emily said that Z.L. had problems at school but he was usually better behaved at school than he was at home. Z.L. had

significant toilet issues at home. Emily said Z.L. urinated "everywhere," including inside his drawers, on his clean clothes, in the laundry room, in clothing baskets, on his carpet, and on his bed. He also defecated and put it behind his dresser and tried to hold onto soiled diapers. Emily said Z.L. had to be put in diapers shortly before he turned six.

Emily recalled a family trip to Sibley where Z.L. finished his snow cone and demanded Emily and Jeff buy him another one or he was going to destroy G.L.'s snow cone. Emily told him that he could not tell them what to do, but Z.L. grabbed G.L.'s snow cone and threw it on the ground. He then began screaming and screamed the entire way back to the car. Emily held his wrists because he would not allow her to hold his hand. She turned the air conditioner in the car on and put Z.L. inside as she sat outside. He screamed that she was hurting him and causing him to bleed. Z.L. also frequently screamed in the grocery store that she was hurting him. Cashen had told Emily that if she walked away from Z.L. when he did this he would eventually get up and rejoin her.

Emily recalled another incident on Father's Day where she had Z.L., G.L., R.L., and F.L. in a bookstore. R.L. had to go to the bathroom, so Emily was going to take all the kids into the bathroom. Z.L. said he did not have to go to the bathroom and refused. She told him to sit in a chair outside the bathroom. A few seconds later, Z.L. urinated on himself and then began screaming that his mother was mean to him and did not take

him to the bathroom, and so he had to urinate on himself.

Emily testified that the family belongs to a church, but they seldom go because Z.L. tried to "sabotage" anything they attempt to do as a family. Emily said either she went alone or with only a couple of the children because there are too many problems when they all try to go together. She said they had trouble getting ready on time. Also, she said that in the van, on the way to church, Z.L. would upset G.L. by telling her "all kinds of horrible things." Emily said they also have toilet problems while at church and problems sitting in the pews.

Emily testified they tried to engage Z.L. in sports. They tried soccer and she volunteered to coach. This was before Z.L. was diagnosed with RAD. Z.L. had so many fits that he had to be taken off the field.

Emily testified they had resorted to the use of gates to protect the other children. At first, they were going to use an alarm; but because Z.L. liked upsetting everyone, both respondents and the doctors were concerned he would use the alarms as another tool. The gates did not confine Z.L., but they made a loud noise when he leaves, giving them a warning.

Emily testified that G.L. was so stressed when Z.L. is around that she sometimes runs in circles. G.L. was very nervous when Z.L. is coming home from school. She had a lot of problems sleeping and with anxiety, so they took her to their family doctor. G.L. was up five or six times a night and wanted to be in the chair in Emily and Jeff's room. The doctor gradually put

her on medicine to help her sleep. Eventually the doctor raised G.L.'s prescription to the highest dosage. Yet, she still got up about twice per night.

Emily said Z.L. did not like to sit at the dinner table with the family and would try to lose privileges anytime they went to do a picnic out in the yard. She said they had a problem with him urinating on himself at the table.

Emily said she did not believe Z.L. had any bond with either her, Jeff, or his siblings. Emily said that once Z.L. told her that he loved them but that they did not love him because they took him to doctors; she tried to explain that they took him to doctors because they did want him and wanted him to get better. Z.L. told her that he should not have to do the things she said, like using the toilet.

Emily testified Z.L. did not seem to care about their pets. She said when he was little he seemed to like Rubin, an elderly golden retriever. She said, "[A]nd the cats outside he seemed somewhat to like, but he would kick them quite frequently."

She said that he damaged a lot of property in their home. At one point, they thought they would have to gut his room because it was so soaked with urine. She said the entire up-stairs of their home smelled like urine. Z.L. destroyed his bed by pulling planks off the frame and ripping the cover off of his box springs. He tore up his toys, even one toy Emily thought was his favorite; he also destroyed the other kids' toys. He also

salivated on his dressers and soaked his blankets in saliva.  She said he frequently tore up his own clothing.

Emily said that she would still be concerned if it was one of her biological children acting like Z.L.  She stated:

> "[T]here is no way I could let any child
> destroy our family the way it is being de-
> stroyed currently, by having us all on medi-
> cation and my children scared and problems
> with sleeping, and it's a big strain on our
> marriage, and it makes every inner working of
> a family scenario very strained and diffi-
> cult."

Even though the evidence offered by the GAL suggested Z.L. did well at school, Emily said getting him to go to school is difficult.  He screamed the entire time, refused to get dressed, refused to go to the bathroom, stood in the driveway screaming until the bus left, and she even once put him on the bus kicking and screaming in pajamas.  She said she was instructed to make him go to school even if he were having a fit.

Z.L. has had a lot of problems with stealing.  In kindergarten, Emily said his teacher patted him down when he got to school and before he left, and Emily patted him down when he got home.  She said he got clever about hiding things up his sleeve and in his underwear, and he would take her and G.L.'s stuff to school and he would take things from school to home.

Emily said Z.L. lied continuously to the point that he

will not tell the truth about what he wants to drink for breakfast.  He would say he wanted juice; but when they bring him juice, he would say he wanted milk.  However, when they bring him milk, he tells them that he already told them he wanted juice.  He will say he does not have to go to the bathroom when he does.  She said he can look them straight in the eye and lie without any guilt or shame.

Emily said that she and Jeff set up a diaper exchange where they would only give Z.L. a diaper if he turned in his dirty one.  Emily said Z.L. refused at times to defecate.  Once he kept himself from having a bowel movement for 21 days.  Emily and Jeff took him to the doctor's office and tried three separate laxatives before they were able to get one to work.  The next day he was scheduled to see a colon-rectal specialist.  Z.L. also refused to wipe himself and just left feces on himself allowing it to fall off throughout the house.  Emily said they had instructed him how to wipe and told him to do so numerous times, but he either laughed or said he did not want to wipe.

Emily said the decision to ask the State's Attorney to assist in filing this petition was not an easy one.  She said:

"This isn't anything any parent wants to do.
We didn't take the boys so we could get rid
of them.  We intended on having other chil-
dren when we took them, and we fully intended
on having a full blended family.  It is dam-
aging the very family structure that we have

- 28 -

to offer to begin with and finally gets to a point where it's like triage; one ship is going to sink or one part and what can we save and what can we do and there aren't any good choices left, but we have an obligation as responsible parents to our children just as much as we do to [Z.L.], and this decision is in the best interest of every member of our family."

Emily said that the increased violence and aggression toward the other children convinced them to file the petition. She said they were hopeful that if Z.L. was in a home with fewer children, he would be able to learn new behavioral patterns for himself. However, Emily said, things in their home digressed so quickly that she did not know how they could keep Z.L. along with their other children and make the family work. Emily said she and Jeff even talked of separating to run two separate house-holds, but decided they could not go through with that idea.

On cross-examination, Emily testified that DCFS offered services; however, she refused because they were already involved in their own treatment at the time. She also said that they were not interested in attachment therapy for Z.L. because attachment therapy had made A.L.'s behavior worse. Emily said if Z.L.'s behavior worsened, someone would likely end up "very, very much hurt." Emily said when DCFS told her the children were "per-fectly normal," she took that to mean that they were healthy,

loving, affectionate, and came from a good family.

Emily testified that they had had foster children in their home prior to A.L. and Z.L. who were not as "damaged" as A.L. and Z.L. She said they were not familiar with RAD at the time. The GAL read aloud from Cashen's notes, which stated that Cashen was unwilling to state that Z.L. was a clear risk of serious physical harm to the other children. Emily said she disagreed, but she understood that the clinical definition of "clear risk" is hard to assign to a child.

Emily admitted she told Dr. Holly that she did not want Z.L. held back because that would mean an additional year in school and, in turn, an additional year in their home. Emily said they were very depressed when she made the comment. Z.L.'s behaviors were escalating and they were not yet considering relinquishing their parental rights.

Emily said that holding him back was in his best interest due to his small size and delayed motor skills. The GAL asked how such a small child could pose a threat. Emily said even though all of the other children are smaller, he was still a threat. She said, "When the threats are physical, you don't have to be a huge person to inflict harm on another. You just have to have the will to do it and be in the position to cause it."

Emily said Z.L. did better academically his second year of kindergarten, but socially he was never invited to parties or asked over to another's classmate's house to play. The GAL asked why the teacher's report in exhibit No. 2 said everyone wanted to

be in Z.L.'s group and his partner. Emily said she could not answer because she was not in the classroom to observe this. Emily said in 2006, the second year of kindergarten, Z.L. no longer had a problem taking things to and from school. However, Emily believed it was what Cashen had described to her as symptom substitution in which his symptoms would change every four to six weeks.

Respondent father, Jeff L., testified as the final witness. Jeff testified that he was a lieutenant with the Champaign County fire department full-time and worked at the University of Illinois Firefighter Training Facility as a side job. He had been a full-time firefighter for 12 years and a teacher at the university for 7. When asked whether he had anything to add regarding Emily's testimony regarding Z.L.'s behavioral problems, Jeff said, "I am sure I could spend hours easily." Jeff said he took offense at the insinuation that he was an absentee father because he worked long hours. He said his schedule was 24 hours on and then 48 hours off. He said he spends a considerable amount of time with his kids. He said every single night for almost two hours, he and Emily talk about how to deal with Z.L.'s behavioral problems.

Jeff recalled a time recently when he worked on the children's playhouse in their backyard for nine hours, six or seven of which Z.L. was screaming nonstop. He said Z.L.'s screaming was the constant background noise in the house. He stated, "[I]t bothers me because I love my children very much,

and I want to provide them a safe and happy, nurturing home to grow up in where at [sic] they bond and that it is a great experience for them, and I can't do that."

Jeff said, "[T]here's this constant background noise of horror.  It is like something out of the movies[,] of the '[E]xorcist.'"  He said at dinnertime all he can do is turn the volume on the television up.  He said it wears on him, and he feels it is unhealthy for his other children.  He said the reason Z.L. had only been successful at causing physical harm a few times is due to the fact that he and Emily work hard to prevent him from having the opportunities to cause physical harm to others.  Jeff testified Z.L. is constantly supervised in their home.

Jeff said Z.L.'s tantrums in public were frequent. Z.L. also vomited at the dinner table.  Jeff said Z.L. found his and Emily's rules amusing and refused to accept them.  The only rules they gave Z.L. were not to hurt anyone, be nice to people, and use the toilet.  However,  Z.L. did not comply.

Jeff said they do not do family activities because Z.L. makes it too difficult.  They no longer go to church or out to eat.  He said occasionally they get a babysitter for Z.L., and the rest of the family goes out, or he will try to take G.L. or R.L. out with just himself.  He said they have never even considered vacations because it was too hard to get to Champaign and back with Z.L., let alone go anywhere further.  Rarely did the family go anywhere on holidays either.  Occasionally extended

family visited, but Z.L.'s behavior invariably spiraled out of control.

Jeff said that there was only a mattress on the floor of Z.L.'s room. Z.L. had no other furniture or toys in his room because he either destroyed them, urinated on them, or spit all over them. Jeff said Z.L. broke the furniture and tried to use it as a weapon against them. Jeff said they thought about the minimalist appearance of his room, but that it was one of Cashen's suggestions during therapy, and they decided to follow it.

Jeff said despite the situation, he loved Z.L. dearly; however, he believed they could no longer help him in their family setting. His behavior was steadily declining and destroy-ing the other children's childhood, especially G.L.'s. Although Jeff acknowledged there may be more solutions for them to try, he stated the "water is coming in so fast, and we can't bail it out fast enough." He said he felt the longer he waited the more destruction would occur until his family was totally demolished. Jeff said that it was "unbearable" and Z.L. would have to move out in the near future even if they were not permitted to relin-quish their parental rights.

On cross-examination, Jeff said Z.L. was currently living with Jeff's in-laws, Emily's parents. He would sometimes come home on weekends. Emily's parents live in Decatur. Jeff said Z.L. is having a number of issues in school, refusing to do assignments, purposely doing things extremely slowly, and gener-

ally trying to control his teacher.  After Z.L.'s grandfather told Z.L.'s teacher of his background, Jeff believed the teacher had been very empathetic to his situation.  The teacher apparently tried a reward system where he could receive a small toy, and Z.L. said, "I don't need your crap.  I got enough at home." Jeff said he believed his in-laws were willing to take Z.L. into their home because they could see the destruction the situation was causing their family.

At the conclusion of the testimony, but before closing arguments, the trial court informed the parties that it was taking the matter under advisement and intended to deliver its decision from the bench at a later date.  The trial court stated as follows:

> "[T]here is no real dispute here about
> the facts in this case.  I am not speaking
> for [the GAL].  But it does not appear there
> is a whole lot of dispute about the facts.
> There, I suspect, maybe [sic] difference of
> opinions about what constitutes [']good
> cause['] and whether or not good cause has
> been shown."

Then the trial court asked counsel the following question:

> "Taking all the testimony about the behavior
> of this young man as true, how is this any
> different from some other disability or medi-
> cal condition that a child could have that

the parents are not capable of dealing with in their own home, in a normal residential situation?  How is this any different from some other medical or other disabling condition that a child could have that a parent-- having nothing to do with parenting skills-- is not capable of dealing with in their own residence?"

Following closing arguments, the parties stipulated to a temporary order of shelter care for Z.L. because Z.L.'s grandparents, with whom he was living at the time, had immediate plans to leave the state.

On October 20, 2006, in open court, the trial court denied respondents' petition.  The trial court acknowledged that the dispute in this case was whether "good cause" had been shown. The court then stated as follows:

"I don't think there is any dispute in the evidence that the testimony indicates that the best interest of this young man would be some kind of residential placement or in a different home with no other children, but we are not at the best[-]interest stage of this proceedings.  We are at the adjudicatory[-]hearing stage, and while there is a tendency of everybody, including the [c]ourt, to think in terms of what is in the best interest of

this young man, that's not where we are at right now.

That's the overriding consideration in all juvenile cases, what's in the best interest, but for purposes of this hearing, we are not yet to best interest.

We are to whether or not there is good cause shown, and we are not even on [the] standard of whether or not the parents have used their best efforts.  That's even farther down the road.  There isn't any question the parents have gone to considerable efforts to try to deal with this young man's problem. ***

I empathize with the [respondents] because my recollection when this child was adopted is that the [respondents] were interested in adopting because they wanted to have children and were not having a great deal of success initially in having children.

I share that experience with them, in that, my wife and I went to some considerable effort before we were able to start our family, and one of the results of the use of extremely powerful drugs to assist in that process is sometimes you get more than you

bargain for, and that was when my wife and I had four children at one time.

The point is, is that life is not always what we expect or thought or anticipate it would be, and I don't mean to unnecessarily focus on Mr. Novick [(respondents' attorney)], but the loss of a child is not what a parent expects to happen in the ordinary course of things. I am sure [respondents] did not anticipate this set of circumstances when they adopted, and I don't mean to minimize the difficult circumstances in which they find themselves. But the answer to my question a month ago has not yet been given.

The question was [']how was this any different from any other unanticipated turn of events, some kind of horrendous situation involving a child that was beyond the ability of the parents to care for or take care of in their own home,['] and there was no answer to that.

Life is not always fair. Sometimes we get circumstances that we did not anticipate, and I realize the standard is a preponderance of the evidence. But I have read and reread, and reread the only case that gives us any

particular guidance in this, and that's [In re J.M., 245 Ill. App. 3d 909, 613 N.E.2d 1346 (1993)]. And I believe it does provide guidance in this case. And I mean no--I don't mean to be unkind of or critical to the parents, but the other question which I have not asked and which I have wrestled with and I don't think it is inappropriate for the finder of fact to be asking that question and that nagging question is: [']If this were a natural born child[,] would we be here?['] And I am not sure we would. I am not sure we would.

I do not think that good cause has been shown in this case. I think there are some factual differences, but I think this case has a great deal of similarity to the In re J.M. case. *** I am in the position of having to objectively evaluate the evidence before me and I think this is a little bit like J.M.; that if-in J.M. you get the idea that, if it were the M.'s child, they would be trying to find some solution.

***

*** There is not good cause."

The trial court acknowledged that it sensed the rela-

tionship between respondents and DCFS was not good based on the respondents' belief that DCFS hid Z.L.'s condition from them at the time of adoption. However, the trial court said DCFS's failure, if any, likely would not have made a difference based on Cashen's testimony that diagnosing RAD in a two-year-old is somewhat impossible. The court denied the State's petition.

This appeal followed.

## II. ANALYSIS

### A. Jurisdiction

As a preliminary matter, this court must address whether it has jurisdiction over this appeal. Respondents, Jeff and Emily, filed the notice of appeal. The State did not file a separate notice of appeal; however, it filed a brief in support of respondents' position. In its brief, the State raises the issue of whether this court has jurisdiction to consider an appeal filed by the parents. However, the State's brief explicitly states it is not contesting the parents' right to an appeal. Moreover, the GAL did not file an appellee brief.

While the more common posture of these cases pits the parents against the State, this case finds the State and parents as allies and the GAL as the sole adversary opposing adjudicating Z.L. a dependent minor. However, the caption of this case reflects respondents in opposition to the State. In fact, respondents are designated as the appellant in the present action and the State as the appellee. The State's brief, however, supports the respondent's argument on appeal. Therefore, the

present situation is one in which both named parties in the case are in agreement in advocating reversal of the trial court.  By its designation, the State, as appellee, is presumed to have received a favorable ruling in the court below.  However, that inaccurately portrays the outcome of this case in which the State's petition was not granted by the trial court due to the GAL's successful opposition to the petition.

The State cites In re Gustavo H., 362 Ill. App. 3d 802, 841 N.E.2d 50 (2005), in which the First District allowed the minors' GAL to appeal the trial court's denial of the State's petition.  Respondent parents in Gustavo H. argued that only the State has the power to prosecute and appeal petitions for adjudication of wardship.  The court in Gustavo H.  held as follows:

> "[T]hough the State has exclusive authority
> in the trial court to prosecute a petition
> brought under the Act, in order to fulfill
> their duty to protect the best interests of
> the minor they represent, the minor's attor
> ney and [GAL] may appeal, on the minor's
> behalf, a trial court's order regarding a
> petition that they believe is contrary to the
> minor's best interests." In re Gustavo H.,
> 362 Ill. App. 3d at 812, 841 N.E.2d at 58.

The court in Gustavo H. did not address whether parents have a similar right to appeal a trial court's denial of a petition for an adjudication of wardship filed by the State, which is the

procedural posture of the present appeal.

Supreme Court Rule 301 states, "Every final judgment of a circuit court in a civil case is appealable as of right. The appeal is initiated by filing a notice of appeal." 155 Ill. 2d R. 301. Supreme Court Rule 303(a) states, "[T]he notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from ***." 210 Ill. 2d R. 303(a)(1). The trial court entered its order in this case on October 20, 2006. Respondents appeal filed their notice of appeal November 17, 2006. Therefore, we find the appeal was timely filed.

Further, respondents have a right to appeal based on the fact they are parties to this case, and their interests are adversely affected by the trial court's ruling. In St. Mary of Nazareth Hospital v. Kuczaj, 174 Ill. App. 3d 268, 270-71, 528 N.E.2d 290, 292 (1988), the First District held as follows:

"Any party to the case may seek appel-
late review from a final judgment which is
adverse to his interests, and whether the
party was actually aggrieved does not deter-
mine his right to appeal. [Citations.] Even
nonparties have standing to appeal provided
they have a direct, immediate[,] and substan-
tial interest in the subject matter of the
litigation which would be prejudiced by the
judgment or benefit by its reversal. [Cita-

tion.]"  <u>Kuczaj</u>, 174 Ill. App. 3d at 270-71,
528 N.E.2d at 292.

While the trial court's ruling meant Jeff and Emily retained their parental rights, the ruling in this case was adverse to their interests insomuch as they were seeking the trial court's permission to voluntarily relinquish those rights. Because the parents were parties to the proceedings in the trial court, had a substantial interest in the outcome of those proceedings, and that outcome was adverse to their interests, they have the right to pursue this appeal.

B. This Case May Be Decided Without an Appellee Brief

The GAL, the only opposition to the State's and respondents' petitions in the trial court, did not file a brief on appeal.  However, reversal is not automatic when the party who received a favorable ruling in the court below fails to file a brief on appeal.  <u>First Capitol Mortgage Corp. v. Talandis Construction Corp.</u>, 63 Ill. 2d 128, 131-32, 345 N.E.2d 493, 494-95 (1976).  "[T]he burden remains on the appellant to show error."  <u>Talandis</u>, 63 Ill. 2d at 132, 345 N.E.2d at 495.  However, "[a] court of review is not compelled to serve as an advocate for an appellee."  <u>In re Marriage of Purcell</u>, 355 Ill. App. 3d 851, 855, 825 N.E.2d 724, 727 (2005).  Also, this court is not required to search the record for the purpose of sustaining the judgment of the trial court, but we may do so if the interests of justice so require.  <u>Talandis</u>, 63 Ill. 2d at 133, 345 N.E.2d at 495.

We may decide the merits of appellant's arguments on appeal where the record is simple, the claimed errors are such that they may be decided based on appellant's brief, and the record supports our finding in favor of appellant. Marriage of Purcell, 355 Ill. App. 3d at 855, 825 N.E.2d at 727. Because respondents' and the State's briefs sufficiently present the issue for review, we will decide the merits of this appeal from the facts and legal arguments before us without the aid of a brief from the GAL. See In re Adoption of G.L.G., 307 Ill. App. 3d 953, 962, 718 N.E.2d 360, 367 (1999).

## C. Standard of Review

In this case, the State was required to prove by a preponderance of the evidence that respondents had demonstrated "good cause" for relinquishing their parental rights to Z.L., thus rendering him a dependent minor. In re S.W., 342 Ill. App. 3d 445, 450, 794 N.E.2d 1037, 1041 (2003). A reviewing court affords great deference to the trial court's decision in an adjudicatory hearing to determine whether a minor is dependent, and that decision will not be disturbed unless it is contrary to the manifest weight of the evidence. In re C.M., 351 Ill. App. 3d 913, 916, 815 N.E.2d 49, 51 (2004); In re Christopher S., 364 Ill. App. 3d 76, 86, 845 N.E.2d 830, 838-39 (2006). "A circuit court's finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident from the record." In re Christopher S., 364 Ill. App. 3d at 86, 845 N.E.2d at 839. Cases involving an adjudication of neglect and

wardship are <u>sui</u> <u>generis</u> and must be decided based on the unique facts of the case.   <u>In re Christina M.</u>, 333 Ill. App. 3d 1030, 1034, 777 N.E.2d 655, 659 (2002).   However, "[t]he best interest and welfare of the minor is the standard applicable to proceedings under the Act."   <u>In re S.W.</u>, 342 Ill. App. 3d at 450, 794 N.E.2d at 1041.

In the present case, respondents argue that "good cause" was shown as a matter of law and the State's petition requesting the respondents be relieved of their parental rights and Z.L. adjudicated a dependent minor should have been granted. The meaning of "good cause," as used in the statute, is reviewed <u>de</u> <u>novo</u>.   <u>In re Adoption of L.R.B.</u>, 278 Ill. App. 3d 1091, 1093, 664 N.E.2d 347, 348 (1996).

### D. Respondents Showed Good Cause to Grant Their Petition for Wardship

Section 2-4(1)(d) of the Act defines a "dependent minor" as a minor "who has a parent *** who <u>with</u> <u>good</u> <u>cause</u> wishes to be relieved of all residual parental rights and responsibilities *** and who desires the appointment of a guardian of the person with power to consent to the adoption of the minor." (Emphasis added.)   705 ILCS 405/2-4(1)(d) (West 2006).   The Act does not define "good cause."

The trial court's decision relied on the 1993 Second District opinion in <u>In re J.M.</u>, 245 Ill. App. 3d 909, 613 N.E.2d 1346 (1993).   In <u>J.M.</u>, the Second District addressed whether good cause was shown under section 2-4(1)(d) of the statute where the parents sought to be relieved of their parental rights as to J.M.

and have him adjudicated a dependent minor.

In J.M., the parents had one natural child of their own and one adopted child, J.M.  J.M. was adopted when he was nine years old.  Catholic Charities, which facilitated the adoption, informed the parents that J.M.'s mother had been neglectful and that he had been abused by his mother's paramours.  The parents realized some slight behavior problems with J.M. initially, but believed they would go away once he acclimated to their family.  Before the adoption was finalized, the parents took a seminar on adopting special-needs children, including children with attention-deficit disorder.

At the suggestion of a social worker, the parents took J.M. off his medication and discontinued his counseling.  The parents also arranged for J.M. to be enrolled in special-education classes.  J.M. was evaluated by a committee at his new school.  The examination concluded that J.M. was well-below grade level and that he had attention-deficit disorder and social-behavioral difficulties.  The committee suggested J.M. see a neurologist.  The parents complied, and later J.M. was transferred to a school with special-education classes more suited to J.M.'s needs.  The parents spent a lot of time with J.M. teaching him how to bathe himself, groom himself, tell time, tie his shoes, and ride a bicycle.  J.M.'s adoptive mother also spent several hours a day helping J.M. with his math, reading, and homework.  J.M. showed improvement in school after the adoption.

The next year, J.M. went to another new school and

began to have problems being "aggressive." Also that year, during a family vacation, J.M. refused to go the bathroom and instead urinated all over himself in the van. This was the first in a pattern of incidents where J.M. urinated and defecated on himself. At this time, J.M. began to show less interest in talking to his adoptive mother than his adoptive father and brother. J.M. had another psychiatric evaluation, which concluded that he was emotionally disturbed but that he was neither neurologically or genetically disturbed. The evaluation also stated J.M. had problems forming attachments to other people. The recommendation was that he be placed in an institutional setting until he was able to support himself.

The State's Attorney filed a petition for wardship of J.M., alleging he was neglected because his parents were not providing for his education and medical care or that they were not providing him food, clothing, or shelter as necessary for his well-being. The parents then filed a counterpetition asking the court to relieve them of all residual parental rights to J.M. for "good cause" under section 2-4(1)(d) of the Act (Ill. Rev. Stat. 1991, ch. 37, par. 802-4(1)(d)).

In J.M., the court acknowledged that the issue of what constituted "good cause" under the Act was a matter of first impression. J.M., 245 Ill. App. 3d at 922, 613 N.E.2d at 1356. In J.M., the court held that considering one purpose of the Act is "'to preserve and strengthen the minor's family ties whenever possible'" (J.M., 254 Ill. App. 3d at 923, 613 N.E.2d at 1356,

quoting Ill. Rev. Stat. 1991, ch. 37, par. 801-2(1)), "good cause" in the context of relinquishing parental rights should include an expression by the parents of a "good-faith effort." J.M., 245 Ill. App. 3d at 923, 613 N.E.2d at 1356. The court in J.M. set forth a fact-specific finding that the parents' conduct in J.M. did not constitute "good cause" under the statute. The court found that the parents acted in good faith while J.M. was in their home, but that they also demonstrated a change in "attitude" when they took the advice to place J.M. in an institution in hopes of being relieved of parental rights. J.M., 245 Ill. App. 3d at 923, 613 N.E.2d at 1356. The court found that the parents' conduct did not "give the appearance of good faith" and that this "undermines their claim" they were acting in J.M.'s best interests.

The trial court's decision in J.M. holds that an expression of good faith by the parents is a component of good cause; however, the court did not set forth a general definition of good cause as it is used in this specific section of the statute. This court is now called upon, as in J.M., to determine whether respondents met their burden under the statute of demonstrating "good cause."

> "'Good cause' is a matter which our courts
> are routinely called upon to assess in a wide
> variety of contexts. See, e.g., 705 ILCS
> 405/2-4 (West 1992); 735 ILCS 5/15-1701
> (b)(1), (b)(2) (West 1992); 755 ILCS

5/28-4(a)(1) (West 1992); 820 ILCS 405/601(A) (West 1992); 134 Ill. 2d Rules 104(c), 105(a), 183, 201(d), 224(b), 306(e), 306(f), 311, 343(c), 374(a), 609(b), 609(c), 776(c); 145 Ill. 2d Rules 222(c), 713(h)."  Fields Jeep-Eagle, Inc. v. Chrysler Corp., 163 Ill. 2d 462, 482, 645 N.E.2d 946, 955 (1994).

While "good cause" has been addressed in other contexts, J.M. is the only Illinois case our research revealed that dealt with "good cause" in the context of section 2-4(1)(d), which provides for parents to relinquish their parental rights under the Act (705 ILCS 405/2-4(1)(d) (West 2006)).

In other contexts under the Adoption Act, courts have held differing views on the meaning of "good cause."  In re Custody of Townsend, 86 Ill. 2d 502, 515, 427 N.E.2d 1231, 1238 (1981) (in the context of a third-party challenge to an adoption proceeding, the court held that the term "good cause" meant a reason to overcome the presumption that the natural parent had the first and superior right to the custody of his child); In re Roger B., 85 Ill. App. 3d 1064, 1069, 407 N.E.2d 884, 889 (1980) (in the context of determining whether to allow adoption records to be unsealed, the court held "good cause" required an analysis of several factors, including the need for the genealogical information, the nature of the petitioner's request, the age and maturity of the adoptee, the proposed use of the information, any countervailing considerations, and "serious" consideration of all

the parties involved).

In the case sub judice, the State argues that respondents worked hard to keep their relationship with Z.L. intact. The trial court's comments while rendering its decision also recognize respondents' "considerable efforts." The evidence of respondents' continual efforts to seek therapy and participate in Z.L.'s treatment demonstrate respondents were not merely trying to renege on their adoption commitments to Z.L. or the State. Rather, the testimony and evidence show that Jeff and Emily did everything they reasonably could in terms of therapy and implementing treatment tasks. Moreover, respondents have been told by the therapists involved in Z.L.'s case that he is unlikely to improve at all if he remains in their home.

Respondents' testimonies reveal their concern in this case is not only for Z.L., but also for their other children living in the home. Parents have a fundamental right to make decisions regarding the care, custody, and control of their child. Wickham v. Byrne, 199 Ill. 2d 309, 316, 769 N.E.2d 1, 4 (2002). If the State interferes with this right, it must comply with the principles of due process. Wickham, 199 Ill. 2d at 316, 769 N.E.2d at 5. The Act states that parents' rights "shall not prevail when the [trial] court determines that it is contrary to the health, safety, and best interests of the child." 705 ILCS 405/1-2(3)(c) (West 2006). However, given the existence of other children in the home for whom respondents are also responsible, consideration of the effect Z.L.'s presence has on the other

children's health and safety may be considered as additional evidence of "good cause."

The State argues this evidence proves that although the Act aims to "strengthen family ties whenever possible," there are no ties to strengthen in this case. We agree. In the present case, unlike J.M., expert testimony revealed Z.L. had no bond with respondents and creating or restoring a bond between Z.L. and respondents was highly unlikely. Cashen particularly opined Z.L.'s best chance for success in life would be in another setting in which he was the only child. Cashen also opined that Z.L. would only get worse if he remained with respondents. Higgins also concluded that Z.L. had no bond with respondents.

Respondents exhausted their possibilities and the expert testimony supports the conclusion that Z.L.'s behavior is unlikely to improve. As discussed earlier, respondents' willing-ness and cooperation in seeking out and implementing treatment show a good-faith effort to sustain a relationship with Z.L. A good-faith effort does not require respondents seek more treat-ment. During the hearing held September 22, 2006, Higgins testified that only 20% to 25% of children with RAD respond to treatment, and respondents had tried several forms of therapy. Higgins stated that the only therapy option left would require Emily, respondent mother, to be completely removed from the lives of her other children, some who were younger than two. Further, Higgins's and Cashen's testimonies indicate no significant studies have shown this type of radical therapy to be more

successful than the therapy approaches respondents had been trying over the past five years.

Respondents had Z.L. in their home for 5 1/2 years. During that time, they visited numerous doctors and other health professionals and implemented various treatment techniques. None of the treatments worked. Respondents are left with few options, and the experts' opinion stated that Z.L. has no bond with them at this point and is highly unlikely to ever improve while in their care and in their home.

Moreover, the trial court's comments indicate that it recognized that granting the petition would be in the best interests of Z.L. However, because the court did not find respondents had shown "good cause," the court concluded that it could not reach the consideration of Z.L.'s best interests.

Z.L.'s situation is devastating to all involved. Over the course of time, Z.L. has not improved; respondents have tried nearly everything, and they are now at a point where the prognosis is grim. While removing Z.L. from respondents' home seems to validate his beliefs that he can trust no one, the evidence reveals that Z.L.'s condition is likely to deteriorate and worsen if he stays in respondents' home. Emily feared the violence would escalate and someone in their home may potentially cause one of their family members serious harm.

This is certainly an untenable situation. Respondents have exhausted their possibilities, and the experts' testimonies fully support the conclusion that very little hope exists for the

situation to ever improve.  Respondents consistently sought treatment and therapy until finally realizing that Z.L.'s best hope for recovery is not in their home.  Respondents' continual good-faith efforts to seek and implement therapy for Z.L., even though such efforts proved unsuccessful, is sufficient to satisfy the statute's requirement that respondents' show "good cause."

### III. CONCLUSION

Therefore, based on the foregoing reasons, we reverse the trial court's decision and remand this case with directions to enter an order adjudicating Z.L. a dependent minor.

Reversed; cause remanded with directions.

McCULLOUGH and TURNER, JJ., concur.