2020 IL App (1st) 191412-U

FIRST DIVISION
January 21, 2020

No. 1-19-1412

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| *In re* A.D., a Minor, | ) | |
| | ) | Appeal from the |
| (THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Circuit Court of |
| | ) | Cook County |
| Petitioner-Appellee, | ) | |
| | ) | No. 17 JA 706 |
| v. | ) | |
| | ) | Honorable |
| AMANDA D., | ) | Andrea Buford, |
| | ) | Judge Presiding. |
| Respondent-Appellant). | ) | |

JUSTICE PIERCE delivered the judgment of the court.
Presiding Justice Griffin and Justice Hyman concurred in the judgment.

## ORDER

¶ 1    *Held*:  The juvenile court's finding was not against the manifest weight of the evidence.

¶ 2    Respondent Amanda D., (Amanda) appeals from an order of the juvenile court finding

Amanda unable to parent A.D., a minor, and adjudicating A.D. a ward of the court.  For the

following reasons, we affirm the judgment of the juvenile court.

¶ 3                               BACKGROUND

¶ 4     Amanda is the mother of A.D., a minor born September 8, 2014.  The father, Felix F. is not a party to this appeal.

¶ 5     On July 18, 2017, the State filed a petition for adjudication of wardship for A.D. alleging that A.D. was abused or neglected based on the fact that A.D. was observed on July 12, 2017 to have bilateral subconjunctival hemorrhages and on July 13, 2017 to have bruising behind both ears.  The petition further alleged that the mother, Amanda, delayed seeking medical treatment for A.D. and provided inconsistent accounts of how A.D. was injured.  That same day, following a temporary custody hearing, A.D. was removed from the home.

¶ 6     On December 14, 2018, the trial court granted unsupervised day visits to Amanda at the discretion of DCFS and overnight visits supervised by the maternal grandparents.

¶ 7     The adjudication hearing took place on February 28, 2019.  The case proceeded by way of stipulations.  The parties stipulated to the admissibility of medical records from Community First Medical Center and Rush University Hospital for the minor.

¶ 8     The parties also stipulated that DCFS investigator Alitze Nevarez would testify that she saw A.D. at Community First Medical Center on July 12, 2017.  A.D. had petechiae extending from her eyes to her neck, redness around her eyes, and what looked like a broken eye vessel.  Amanda stated that she initially noticed the redness four days prior but thought that it was an allergic reaction or eczema.

¶ 9     Amanda told Nevarez that she brought A.D. to her boyfriend's house on Saturday, July 6, 2017, but returned home later that night. A.D. told Ms. Nevarez that, "the only thing she believed may have caused redness to [the] minor's face was [the] minor falling off the couch while

sleeping after returning from her boyfriend's house." Amanda later said there were no falls or trauma.

¶ 10    Jackie Meyers, an Advanced Practice Nurse at Community First Medical, stated that hemorrhaging to both eyes and petechiae were not exclusive to abuse and there could be other causes. There were no marks or indications of trauma on the rest of A.D.'s body. However, Community First Medical Center still had concerns for non-accidental trauma.

¶ 11    A.D. was taken to Rush University Hospital for a second opinion. A.D.'s facial rash was found to be inconsistent with eczema or a fall from the couch. Instead, they were found to be the result of ruptured capillaries the skin and eyes, which can occur with increased pressure due to strangulation, suffocation, or direct blows to the head. While Amanda was at Rush University Hospital, she disclosed to a hospital worker that "her boyfriend has psychological issues and had to be hospitalized one month prior to minor being at Rush. She also stated she did sleep at her boyfriend's house on the previous Friday night."

¶ 12    It was further stipulated that at the time of A.D.'s injuries, Amanda and A.D. resided with several relatives.

¶ 13    On July 14, 2017, DCFS took protective custody of A.D. based on the findings at Rush, because Amanda gave conflicting stories to the hospital and Nevarez, and because Amanda delaying seeking medical treatment for four days.

¶ 14    Based on the stipulations, the juvenile court found that the State had met its burden by a preponderance of the evidence that A.D. was neglected due to lack of care, an injurious environment, and abused due to a substantial risk of injury. The trial court entered an adjudication order finding that A.D. was abused or neglected based on lack of care, an injurious

environment, and substantial risk/physical abuse. The court made the additional finding that the perpetrator was unknown.

¶ 15    The dispositional hearing took place on June 3, 2019. The State introduced 11 exhibits. Amanda introduced one exhibit.

¶ 16    Ms. Alicia Wimbley, a caseworker at ChildServ, testified that she was the assigned caseworker from July 2017 until May 2019. She testified that A.D., now four, was placed with a relative in an unlicensed foster home. A.D.'s new caseworker had visited A.D. at the home and found the placement safe and appropriate with no signs of abuse or neglect.

¶ 17    Wimbley testified that Amanda had been referred for therapy, a JCAP substance abuse assessment, parenting classes, domestic violence sessions, parenting coaching, and a psychiatric assessment. Amanda was engaged in individual therapy and was making progress. She completed her JCAP assessment and no services were recommended. The assessment noted inconsistencies with Amanda's self- reported substance use and stated, "During the assessment, the client appeared to be evasive and guarded when discussing her past and present substance use." Wimbley reported that Amanda gave three negative urine drops for drugs in 2017 and stated that the agency did not require any random urine drops from Amanda as the agency did not suspect her of using drugs. Wimbley also testified that Amanda completed parenting classes and parenting coaching.

¶ 18    The juvenile court raised concerns about the therapy report stating that "this report indicates [Amanda] missed five of the seven – five out of nine [therapy sessions]." The therapy report showed that Amanda had, in fact, missed or cancelled six appointments in March starting with March 4, 2019, and cancelling or not showing up to every weekly appointment until she

attended one on April 4, 2019. Amanda's attorney stated the missed appointments were not her fault.

¶ 19   Wimbley stated that Amanda was receiving psychiatric services through Thorek and was still engaged in those services. Wimbley testified that Amanda was diagnosed with depression and anxiety and self-reported compliance with her prescribed medications. Wimbley also reported that Amanda had completed domestic violence classes.

¶ 20   Wimbley testified that she had received Amanda's May 28, 2019 psychiatric report on the day of the dispositional hearing, and she had not yet read it. Wimbley stated that she was made aware, that day, that Amanda was seeing a different psychiatrist. Wimbley testified that she was not aware that the new psychiatrist diagnosed Amanda with major depression, severe. The May 2019 psychiatric report stated that Amanda had been seeing a different psychiatrist for the last year but had little to no success on any medications that she had been prescribed. It also stated that Amanda had been off her psychotropic medication for the past two months and was experiencing issues with sleep, energy, concentration, and restlessness nearly every day. Amanda admitted to the psychiatrist that she had racing thoughts, hyperactivity, was easily distracted and participated in risky behavior. Amanda reported being inattentive, distracted, and restless, misplacing things or losing things and often making careless mistakes.

¶ 21   The juvenile court raised concerns that Wimbley had staffed the case without receiving the updated psychiatric report from a new psychiatrist. The court stated, "the report from the psychiatrist is not favorable for the mother. And when it was staffed by the Department, they didn't even have a copy of that report." The juvenile court stated that it was "uncomfortable,

very. I read all this stuff. Extremely uncomfortable. And as I said, I am amazed that the Department even made a [return home] decision without reviewing all the documents."

¶ 22    Wimbley concluded her testimony by stating she had staffed Amanda's case and her agency recommended that A.D. be returned home under a protective order.

¶ 23    The juvenile court refused to order a return home and entered an order adjudging A.D. a ward of the court and appointed the DCFS guardianship administrator as A.D.'s guardian.  The court found Amanda unable to care for, protect, train or discipline the minor.  The court stated its concern with returning the child home finding that "I'm not [allowing return home] because there are too many open questions . . . for me that I don't feel safe. I don't feel like it is in this minor's best interest at this time.  [U]ntil I get something more from the therapist and the psychiatrist, I'm not doing it."  The court then asked for the Juvenile Court Clinic to evaluate Amanda and the case was continued to October 2, 2019, for the clinic's report.

¶ 24    On July 3, 2019, Amanda appealed the juvenile court's adjudication.

¶ 25                                    ANALYSIS

¶ 26    Amanda first argues that the juvenile court erred when ruled against returning A.D. home at the dispositional hearing instead of continuing the case to obtain clarifying information.  We must reject this argument because the record establishes that Amanda never requested a continuance to present any clarifying information.  The issue is forfeited.

¶ 27    Amanda also argues that the trial court's ruling against returning A.D. home is against the manifest weight of the evidence.

¶ 28    If the trial court finds a minor abused, neglected, or dependent, the court is to hold a dispositional hearing to determine whether it is consistent with the health, safety, and best

interests of the minor and the public that he be made a ward of the court. 705 ILCS 405/2-21(2) (West 2016). The minor may be made a ward of the court, if the court determines that the parents or guardian:

> "are unfit for some other reason than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of his or her parents, guardian or custodian." *Id.* § 2-27(1).

¶ 29    In a best interest hearing, the focus of the termination proceeding shifts to the child, and the parent's interest in maintaining the parent-child relationship must yield to the child's interest in having a stable and loving home life. *In re D.T.*, 212 Ill. 2d 347, 363 (2004). The State must prove by a preponderance of the evidence that termination is in the child's best interest. *Id.* at 366. The trial court's determination will not be reversed unless it is against the manifest weight of the evidence. *Id.* A decision is against the manifest weight of the evidence only when the opposite conclusion is clearly evident. *In re Z.L.*, 379 Ill. App. 3d 353, 376 (2008).

¶ 30    Cases involving an adjudication of abuse and neglect and wardship are *sui generis* and must be decided on the unique facts of the case. *Id.* In this case, at the adjudication hearing, the juvenile court found A.D. was abused and neglected based on the injuries to her face and neck and that Amanda delayed seeking medical treatment and gave conflicting stories of what occurred.

¶ 31    At the dispositional hearing in June 2019, Wimbley testified that her agency, as well as Amanda's caseworker and other parties involved were recommending that A.D. be returned home based on Amanda's progress. Amanda was engaged in individual therapy and was making

progress. She completed her JCAP assessment and no services were recommended. Amanda completed parenting classes, domestic violence classes and parenting coaching.

¶ 32     However, as the trial court noted, Amanda missed several therapy sessions.  In addition, the decision to recommend that A.D. be returned home was done so without considering the latest psychiatric report.  The latest psychiatric report, received after the return home recommendation was made, showed that Amanda had been diagnosed with severe major depression, and although Amanda had been seeing a different psychiatrist for the last year, she had little or no success on any medications that she had been prescribed.  It also stated that Amanda had been off her psychotropic medication for the past two months and was experiencing issues with sleep, energy, concentration, and restlessness nearly every day and she admitted to the psychiatrist that she had racing thoughts, hyperactivity, was easily distracted and participated in risky behavior.  She also reported being inattentive, distracted, and restless, misplacing things or losing things and often making careless mistakes.   Therefore, the recommendation to return A.D. home was made without having all of the pertinent information.

¶ 33     The evidence presented at the best interest hearing was more than sufficient to support the juvenile court's determination making A.D. a ward of the court.  The juvenile court was clearly considering A.D.'s best interest when it refused to return A.D. to her mother where Amanda's mental health and stability was questionable.  Amanda's completion of the services required of her is encouraging. but unfortunately, completion of those services does nothing to negate the fact that at the time of the dispositional hearing, she was mentally unstable according to the psychiatric report. Based on this record, we cannot say that the juvenile court's decision adjudicating A.D. a ward of the court was against the manifest weight of the evidence.

¶ 34                                  CONCLUSION

¶ 35    The judgment of the juvenile court is affirmed.

¶ 36    Affirmed.