2023 IL App (1st) 221345-U
Order filed March 9, 2023

FIRST DISTRICT
FOURTH DIVISION

No. 1-22-1345

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST DISTRICT

_____

| | | |
|---|---|---|
| *In re* J.C., a Minor, | ) | Appeal from the |
| | ) | Circuit Court of |
| Appellee, | ) | Cook County. |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 19 JA 769 |
| | ) | |
| v. | ) | |
| | ) | |
| Joy B-R., | ) | Honorable |
| | ) | Shannon P. O'Malley, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE ROCHFORD delivered the judgment of the court.
Presiding Justice Lampkin and Justice Hoffman concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court's finding that the minor was neglected, as opposed to dependent through no fault of the mother, was not against the manifest weight of the evidence.

¶ 2    Following adjudication and disposition hearings, the trial court, pursuant to the Juvenile Court Act (Act) (705 ILCS 405/2 *et seq.* (West 2018)), found that the minor, J.C., was neglected and abused, adjudicated her to be a ward of the court, and placed her in the guardianship of the Department of Children and Family Services (DCFS). On appeal, respondent-appellant, Joy B-R.,

(the mother) contends the trial court erred in denying her motion for a continuance of the adjudication hearing and in disallowing certain lay opinion testimony by the mother at the hearing and the findings of neglect and abuse, as opposed to no-fault dependency, were against the manifest weight of the evidence. We affirm.

¶ 3    J.C. was born on April 7, 2002, in Jamaica. The mother would spend time in the United States without J.C. and, in 2012, the mother met her current husband, Rondo R. (the stepfather), in Illinois. A year later, J.C. moved to the United States and into the stepfather's home.

¶ 4    On July 19, 2019, the State filed a petition for adjudication of wardship against the mother and Emerson C., J.C.'s father, (the father)[1] contending that J.C. was neglected pursuant to section 2-3(1)(b) [injurious environment] and abused pursuant to sections 2-3(2)(i) [physical abuse] and 2-3(2)(ii) [substantial risk of physical injury] of the Act. *Id.* § 2-3(1)(b), (2)(i), (2)(ii). The State also filed a motion for temporary custody. In both, the petition and motion the State alleged:

> "On or about July 15, 2019, mother and this minor got into a physical altercation [(July incident)]. Mother admits hitting this minor with a shower curtain rod and a wooden object repeatedly. This minor was observed with a laceration to her head and multiple areas of redness and swelling on her arms and legs. Medical personnel state that these injuries were inflicted and are consistent with this minor being struck with a wooden object and shower curtain rod. This minor has a history of being diagnosed with bipolar disorder and depression. Mother admits that this minor is not currently taking her psychotropic medication and is not engaged in mental health services."

¶ 5    The State supported these factual allegations with the affidavit of Bridgett Jackson, a DCFS

---

[1] The father is not a party to this appeal.

investigator. Jackson also averred that J.C. received treatment for multiple injuries at Comer Children's Hospital (Comer) and the mother was arrested. On that day, the court found that probable cause existed that J.C. was abused or neglected and granted temporary custody of J.C. to DCFS and appointed a guardian *ad litem* (GAL) for J.C.

¶ 6    The mother later filed an affirmative defense, asserting that, pursuant to section 2-4(1)(c) of the Act (*id.* § 2-4(1)(c)), J.C. was dependent by no fault of the mother, and alleging that J.C. had a history of running away, mental health issues, and behavioral difficulties.

¶ 7    On September 20, 2021, the mother filed a motion for a continuance of the adjudication hearing, that was scheduled for September 22. The mother sought time to investigate whether J.C.'s arrest on May 20, 2021, for criminal damage to property (May incident) was relevant to the mother's affirmative defense of "self-defense and dependency." According to the police report, during an argument with her former boyfriend, J.C. damaged the exterior of his vehicle with a brick and cut holes in the seats and was taken to the hospital after accidentally injuring herself.

¶ 8    On September 22, 2021, after hearing arguments on the motion for continuance, the trial court denied the motion and proceeded to an adjudication hearing.

¶ 9    To begin the hearing, the State presented a stipulation that, if called as witnesses, Chicago Police Department (CPD) officers would testify that the mother filed three missing person's reports regarding J.C., which were closed each time after J.C. returned home.

¶ 10    The State and the mother also introduced J.C.'s medical records from Hartgrove Hospital (Hartgrove), Riveredge Hospital (Riveredge), Roseland Community Hospital (Roseland), Garfield Boulevard Hospital (Garfield), Saint Elizabeth Hospital (St. Elizabeth), Mercy Home for Boys and Girls (Mercy Home), and Comer, which were admitted without objections.

¶ 11    J.C. was admitted to Hartgrove on a number of occasions in 2016. On March 31, 2016,

Screening, Assessment, and Support Services (SASS)[2] referred J.C. to Hartgrove after an overdose of Ibuprofen. At the time, J.C. was upset with the mother, admitted to making suicidal statements and cutting herself, and felt stressed by the arguments between her, the mother, and the stepfather.

¶ 12     J.C. reported to Hartgrove staff that, prior to 2013, she lived with her brother while the mother was working in the United States. During that time, J.C. was sexually assaulted by her brother's friend. When the mother later found out about the abuse, she took J.C. to a hospital emergency department in Jamaica. Upon her discharge from Hartgrove on April 9, J.C. was diagnosed with major depressive disorder and unspecified mood disorder and prescribed medication. The recommendations included medication monitoring, outpatient counseling, and participation in Hartgrove's partial hospitalization program (PHP).

¶ 13     J.C. participated in the PHP from April 11 to 20. The PHP involves individual, family, and group therapy. When a family session was offered, the mother told staff that J.C. would be going to Jamaica and would not be able to attend. The therapist offered a family session by phone, but the mother was unavailable. The PHP discharge instructions included recommendations for aftercare outpatient services through Ada S. McKinley Community Services (McKinley).

¶ 14     J.C. was readmitted to Hartgrove on April 30, 2016, based on suicidal ideation following an incident at home. According to a psychiatrist's assessment, an altercation occurred after J.C. returned from a visit to Jamaica and the mother found her texting the father and took her phone. J.C. tried to leave the house, but the stepfather "put [her] in a chokehold" and she fought back. J.C. told emergency personnel that she would kill herself if she had to return to the home.

---

[2] SASS is a program for minors experiencing a mental health crisis. The SASS initiative is a cooperative partnership between DCFS, the Department of Healthcare and Family Services and the Department of Human Services. See *Screening, Assessment, and Support Services*, HFS, https://www2.illinois.gov/hfs.aspx (last visited Jan. 20, 2023).

¶ 15    At a family therapy session, the stepfather apologized to J.C. for being physical with her. The social worker recommended that the family continue to participate in outpatient therapy. J.C. was discharged on May 20, diagnosed with unspecified mood disorder, and instructed to schedule a follow-up appointment for outpatient counseling and participate in the PHP. The mother and J.C. were educated on the use, management, and administration of the prescribed medication.

¶ 16    J.C. returned again to Hartgrove on May 24, 2016, for suicidal ideation and physical aggression. The treatment plan recommended that J.C. participate in the PHP and family therapy. J.C. received medication which helped with her anger. During the hospitalization, a therapist contacted the mother to review the crisis safety plan, but the mother told the therapist she would call back. The mother also declined an invitation by the therapist to schedule a family therapy session. J.C. was discharged on June 8, diagnosed with unspecified mood disorder, and prescribed medication. The mother was instructed to set up outpatient services at McKinley.

¶ 17    J.C. was admitted to Riveredge on June 15, 2016, for suicidal ideation. The mother informed the admitting physician that J.C. had been noncompliant with her medication, which J.C. denied. J.C. explained that, on June 14, after an argument, the mother called SASS and had her taken to the hospital. J.C. has a hard time communicating with the mother in that the mother does not listen. She felt depressed but denied suicidal ideation.

¶ 18    While at Riveredge, J.C. received medications and was encouraged to participate in various therapies. The mother told a therapist that she wanted J.C. discharged so J.C. could return to Jamaica. During a family session, J.C. became upset when the mother did not show understanding as to her sexual abuse. J.C. was discharged on June 29; diagnosed with depression, bipolar affective disorder, and oppositional defiant disorder; and instructed to continue with medication and follow up at McKinley. The mother was instructed to schedule an intake assessment.

¶ 19    J.C. was seen at Roseland on August 21, 2016, following an altercation with the mother after the mother found a condom wrapper, which J.C. maintained was not hers. While at Roseland, the mother and the stepfather became irate and indicated that they were sending J.C. back to Jamaica "because they can't do anything with her."

¶ 20    That day J.C. was transferred to Garfield. J.C. had superficial scratches on her arm and pain in her midback and hand. The social worker's notes indicated that the mother's and J.C.'s stories as to the incident did not entirely coincide. The mother said that, during the altercation, J.C. physically attacked and pulled a knife on her and the stepfather causing them to physically restrain J.C. According to J.C., the mother hit her in the face three times and the stepfather had her head against the stove and threw her to the ground, which was when knives just fell to the ground. J.C. bit the mother because the mother was sitting on her chest and she could not breathe.

¶ 21    During the initial assessment, J.C. reported that her brother's friend sexually assaulted her throughout a six-month period and that she had a prior diagnosis of bipolar disorder. The staff provisionally diagnosed J.C. with unspecified mood disorder and identified additional problems including issues with her primary support, potential harm to self, post-traumatic stress disorder (PTSD), aggression, disruptive mood dysregulation disorder (DMDD), and risky behaviors.

¶ 22    The mother informed a social worker that J.C. had not been receiving treatment and did not have a provider for medication management. In a family session, the mother said that she was planning to take J.C. back to Jamaica in December and that she was not afraid of DCFS." J.C. was discharged on September 2 and the social worker expressed to the mother the importance of aftercare for J.C., including outpatient services at McKinley.

¶ 23    J.C. was next hospitalized at St. Elizabeth on November 8, 2016, two days after she was raped walking home from an after-school program, which triggered memories of her past abuse.

After engaging in various therapies, J.C. was discharged on November 17, diagnosed with depression, prescribed medication, and instructed to engage in outpatient therapy.

¶ 24    According to the Mercy Home records, J.C. became a resident, on January 3, 2017, because the mother feared for J.C.'s safety. J.C. was having arguments with the stepfather when the mother was not around. The mother reported that the stepfather tried to "frame" J.C. by doing such things as stealing money and putting cigarettes in J.C.'s bag, and then placing the blame on J.C. The mother feared that the stepfather would "plant his gun" on J.C. to get her in trouble at school. The stepfather had been physical with J.C. He had put J.C. in a chokehold and handcuffed her to a door. J.C. was preliminarily diagnosed with PTSD and major depressive disorder. The treatment plan focused on J.C. addressing her "trauma narrative."

¶ 25    J.C. was permitted to visit the mother on April 21, 2017. During the visit, J.C. left without telling the mother where she was going. The mother filed a missing person's report with the police two days later. On May 1, Mercy Home was notified that J.C. was at school. J.C. told Mercy Home staff that she had been staying at a friend's home and did not wish to return to Mercy Home. The mother explained that J.C. could not return home because the stepfather did not want her there. Mercy Home discharged J.C. on May16 with instructions to participate in aftercare services.

¶ 26    The Comer records relate to the July incident. On July 15, 2019, J.C., arrived at Comer, complaining of dizziness and pain on her head, right forearm, right leg, and both thighs. In discussing the incident, J.C. explained that she was looking at herself in the mirror when her towel began to slip. J.C. saw the mother looking at her and told her to stop. The mother stated, "What I'm not gay." J.C. was upset but decided to "cool off" in the bathroom. The mother entered the bathroom with a wooden bat and hit J.C. on the arms, legs, and head and also hit her with a metal shower curtain rod. J.C. noticed blood on her head and called 911. The mother told J.C., "I'm

going to kill you." J.C. received two staples to close a two-centimeter laceration on her scalp and had bruising on her right forearm, right leg, and both thighs. Medical personnel concluded that J.C.'s injuries were consistent with being hit with a shower curtain rod and a wooden object.

¶ 27    At the hearing, the State called the mother and Jackson as witnesses. During direct examination, the mother testified as to J.C.'s hospitalizations. Some of the hospitalizations occurred after arguments with the mother or an altercation with the mother and the stepfather. At other times, J.C. was admitted to a hospital due to suicidal ideations.

¶ 28    The mother asserted she administered the medications which were prescribed as a result of J.C.'s hospitalizations. The mother believed J.C. had depression but denied that J.C. had "mental issues." The mother did not remember that J.C. had been diagnosed with bipolar disorder. She knew that J.C. had been sexually assaulted in Jamaica.

¶ 29    After J.C. left Mercy Home in May 2017, she went "back and forth" to Jamaica until July 2018. After July 2018, J.C. was not taking medications and not receiving treatment. The mother testified that J.C. saw an individual therapist until J.C. no longer wanted to continue. The mother did not remember the name of the therapist.

¶ 30    On the day of the July incident, the mother spoke with Jackson at the police station. The mother told Jackson that J.C. had stopped taking her medication years ago and had been out of control. She denied telling Jackson that she hit J.C. with a wooden object.

¶ 31    On examination by the GAL, the mother denied that she had feared for J.C.'s safety when she was alone with the stepfather and that the stepfather was physical with J.C. He handcuffed her but did not put her in a chokehold. The mother testified that J.C. tried to get her to believe that the stepfather was putting cigarettes in J.C.'s bag. The mother admitted that she told Mercy Home staff that J.C. could not come home because the stepfather did not want her there.

¶ 32    On cross-examination by the mother's counsel, the mother testified that, in 2007, she came to the United States without J.C. "for a little while" and left J.C. in the care of J.C.'s brother. At some point, the mother, while in the United States, learned that J.C. had been sexually assaulted. When asked whether this was the reason, she returned to Jamaica, the mother clarified that she went back because her work contract ended.

¶ 33    In 2013, J.C. moved to the United States and into the stepfather's home. In July 2019, the mother and J.C. moved into an apartment. Between 2013 and 2019, J.C. would become angry "a lot of times," smash things, and take the mother's electronics. A couple of weeks before the July incident, J.C. threw a knife at her. When arguments would escalate, the stepfather would tell the mother to call the police. The stepfather called the police on J.C. about 25 times in 2016. Sometimes, the mother would ask the stepfather not to call the police, but he would do so anyway.

¶ 34    The mother further explained the altercation that led to J.C.'s hospitalization at Hartgrove in April 2016. J.C. was in the bathroom, when the mother learned that she was "cutting herself" and had swallowed "a bunch" of Ibuprofen. The stepfather kicked down the door. J.C. had a sharp plastic object in her hand, which the stepfather tried to take. J.C. kicked, punched, and bit him. The mother helped to restrain J.C. and the stepfather handcuffed J.C. to a door.

¶ 35    J.C.'s hospitalization at Roseland took place after the mother tried to talk with J.C. about a condom wrapper the mother found. J.C. became upset and "started destroying everything in the room." The stepfather called the police after J.C. bit the mother's hand.

¶ 36    The mother knew that J.C. needed help. The mother called the police, took her to hospitals, and called "so many places," including SASS "so many times." When J.C. would return from the hospitals, her behavior did not change and her "violent outbursts" "happened a lot."

¶ 37    Between 2013 and 2019, J.C. "would go missing" and on occasions she went back to

Jamaica and the mother did not know whether or not J.C. was safe.

¶ 38    J.C. went missing in the middle of July 2019 but returned to the one-bedroom apartment on the day of the July incident. J.C. slept in a bed in the living room. In the morning, the mother walked into the living room and saw J.C. on the bed. J.C. was not wearing clothes and smelled like "marijuana." The mother told her "this is not the way for you to behave. I'm your mother, you have to behave." J.C. went to the bathroom and the mother followed. J.C. moved toward the shower and pulled down the shower curtain. The mother testified that J.C. "constantly hit" her with the shower curtain rod, leaving a bump on her head. The mother, scared, picked up a shoe from the ground and hit J.C. The mother and J.C. shoved and hit each other. They ended up back in the living room where J.C. fell to the ground, hitting her head on a windowsill. J.C. had a gash on her head. The mother had injuries "everywhere." The mother had never owned a wooden or metal bat.

¶ 39    When asked whether J.C. was strong, the State objected to the question stating: "How does she know how strong she is?" The mother's counsel responded, "It's a lay opinion, *** about the strength of her own child." The trial court sustained the objection.

¶ 40    The mother continued her testimony and stated that J.C. thought the stepfather was too strict and that J.C. would made up stories about the stepfather trying to get her into trouble. The mother never witnessed the stepfather putting cigarettes into J.C.'s bag or physically attacking J.C.

¶ 41    On redirect-examination by the State, the mother said that she assumed that she told Jackson that J.C. fell and hit her head. The mother claimed that after being at the police station for the July incident, she was taken to a hospital. She could not remember which hospital or if she had documentation from the visit. The stepfather was over 6 feet tall; J.C. was under five feet tall. The stepfather had handcuffs because he was a security officer.

¶ 42    On recross-examination, the mother testified that she told Jackson that J.C. hit her on the

head with the shower curtain rod and that her chest hurt and showed Jackson her injured hand and the bump on her head. The mother explained that she was taken to a side entrance of a hospital and examined by a nurse for 20 minutes and later had x-rays taken at the police station.

¶ 43    Jackson testified that, on July 15, 2019, she was assigned to investigate the July incident. J.C. was at Comer with injuries. The mother was indicated for cuts, welts, and bruises to J.C.

¶ 44    On that date, Jackson talked to the mother at the police station. The mother told her that she had eight children, only J.C. lived with her and the stepfather. J.C. had behavioral problems, had been hospitalized numerous times, was not taking her medication, and was not receiving mental health treatment. The mother had been looking for assistance to address J.C.'s issues.

¶ 45    The mother described the July incident for Jackson. She found J.C. laying in the living room naked, which began an argument and a "tussle." The mother and J.C. ended up in the bathroom where J.C. hit the mother with a shower curtain rod. The mother grabbed the rod and hit J.C. with a wooden object. Jackson's notes did not reflect that the mother hit J.C. with a shoe and also did not reflect that J.C. hit her head on a windowsill. The mother indicated that her chest hurt and that she had a wound on her finger and redness on her head, but had not gone to the hospital.

¶ 46    During a July 16. interview, J.C. told Jackson that after showering, the towel on her body fell down. The mother said, "I'm not gay, I'm not gay." They got into an altercation and ended up in the bathroom. The mother hit J.C. five times with a wooden bat. J.C. was bleeding and locked herself in the bathroom until the police arrived. J.C. did not think that she pulled down the shower curtain rod and denied hitting the mother with it. J.C. suffered from depression and bipolar disorder. Since 2017, J.C. had not taken any medication, but was self-medicating with marijuana. J.C. never left home on her own; she was either asked to leave or "put out" each time. Jackson was concerned for J.C.'s safety and placed her in protective custody.

¶ 47 At the request of the State, the court admitted videos recorded by the body cameras of three CPD officers who responded to the July incident. In the videos, the mother and J.C. were yelling over each other in attempts to speak to the officers and explain why the other's version of events was incorrect. There was blood on the back of the bathroom door and a shower curtain rod in the living room. J.C.'s head was bleeding. The stepfather was present in the apartment.

¶ 48 In one video, the officer was standing closer to J.C. She was in a towel yelling there was blood. J.C. explained that she had injuries on her head, arm, and legs from the mother who hit her with a wooden bat and a shower curtain rod. J.C. stated that she went into the bathroom and the mother came after her with a bat, "dragged" her through the apartment, and told her she was going to kill her. J.C. stated that she did not touch the mother. J.C. thought that the mother threw the bat out the backdoor of the apartment. The officer did not find a bat. In response to a question from one of the officers, J.C. stated that she lived at the apartment. The mother and the stepfather maintained that J.C. had been on the run as it was her habit for years and did not live in the apartment and could not remain there. The officers responded that J.C. was a minor and the apartment was her home.

¶ 49 In a second video, the officer was standing closer to the mother. She yelled, "this girl has given me a problem for over five years" and "ruined everything." The mother explained that J.C. had run away multiple times and she had called the police on J.C. at least 20 times. The stepfather stated, "we've been through this before okay. *** Should have left her a*** in Jamaica the second time." The mother stated, "I'm begging what can I do to get rid of her."

¶ 50 In the third video, additional officers arrived, and escorted the mother to a police vehicle.

¶ 51 In closing arguments, the State and the GAL sought findings of neglect due to injurious environment, abuse due to substantial risk of injury and physical abuse, and that mother was the

perpetrator. The mother argued she was acting in self-defense during the July incident and sought a finding of dependency.

¶ 52     In its oral ruling, the trial court recognized that J.C. had mental health needs and had been hospitalized but that the mother had an obligation to make sure J.C. continued to receive treatment. The court detailed J.C.'s injuries from the July incident, which were consistent with being hit with a wooden object and found Jackson's testimony to be credible. In concluding the mother lacked credibility, the court reasoned, "She wasn't even sure if her daughter had mental health needs. She was unsure about medicine. There was confusion as to the other testimony."

¶ 53     The trial court entered a written adjudication order finding that J.C. was neglected pursuant to section 405/2-3(1)(b) [injurious environment] and abused pursuant to sections 405/2-3(2)(i) [physical abuse] and 405/2-3(2)(ii) [substantial risk of physical injury] of the Act. 705 ILCS 405/2-3(1)(b), (2)(i), (2)(ii) (West 2018) and that the mother was the perpetrator.

¶ 54     On August 12, 2022, the court held a disposition hearing and entered a written order adjudicating J.C. a ward of the court finding the mother unable for some reason other than financial circumstances alone to care for, protect, train, or discipline J.C. and placed J.C. in the guardianship of DCFS. The court proceeded to a permanency hearing and entered a goal of independence for J.C. The mother appealed.

¶ 55     The Act provides a "step by step" process for deciding whether a minor should be removed from his or her parents, made a ward of the court, and whether parental rights should be terminated. *In re Arthur H.*, 212 Ill. 2d 441, 462 (2004). After a petition for wardship has been filed and a minor has been placed in temporary custody, the trial court conducts an adjudicatory hearing, where the court must consider whether the minor was abused, neglected, or dependent. *Id.*; 750 ILCS 405/2-21(1), (2) (West 2018). The purpose of the adjudication hearing is to determine

whether the minor was neglected or abused, rather than whether the parent was neglectful or abusive. *In re Yohan K.*, 2013 IL App (1st) 123472, ¶ 108 (citing *Arthur H.*, 212 Ill. 2d at 467). If the trial court determines that a minor was abused, neglected, or dependent, the court then conducts a disposition hearing to determine whether it is consistent with the health, safety, and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.* § 2-21(2).

¶ 56    J.C. turned 20 years old during the pendency of this case. However, the Act protects "any *** minor 18 years of age or older for whom the court has made a finding of probable cause to believe that minor is abused, neglected, or dependent *** prior to the minor's 18th birthday." 705 ILCS 405/2-3(1)(a), (b) (West 2020). The trial court made a finding of probable cause that J.C. was abused or neglected prior to her 18th birthday, and the Act allows her to remain a ward of the State until her 21st birthday. *Id.* § 3(1)(a).

¶ 57    On appeal, the mother only challenges the adjudication order, not the disposition order. Thus, we limit our review to the adjudication order. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 58    In adjudication proceedings, the State has the burden to prove, by a preponderance of the evidence, that the minor was abused, neglected, or dependent. *In re A.P.*, 2012 IL 113875, ¶ 17. Stated another way, the State must prove that the allegations are more probably true than not. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). Cases adjudicating wardship "are *sui generis* and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463.

¶ 59    The trier of fact is afforded broad discretion in determining the existence of neglect, abuse, or dependency because it "is in the best position to determine the credibility and weight of the witnesses' testimony as it has the best opportunity to observe the demeanor and conduct of the parties and witnesses." *In re Jaber W.*, 344 Ill. App. 3d 250, 258 (2003) (citing *In re E.S.*, 324 Ill. App. 3d 661, 667 (2001)). On review, we will not disturb the trial court's determinations unless

they are against the manifest weight of the evidence. *Arthur H.*, 212 Ill. 2d at 464. A determination is against the manifest weight of the evidence where the opposite conclusion is clearly apparent. *In re D.F.*, 201 Ill. 2d 476, 498 (2002).

¶ 60    The mother maintains that the court's findings at the adjudication hearing that J.C. was neglected and abused, as opposed to a finding of no-fault dependency, were against the manifest weight of the evidence. However, in her briefs, the mother primarily argues that the trial court erred in finding that J.C. was abused because, during the July incident, the mother acted in self-defense and the court incorrectly believed Jackson's testimony as to J.C.'s account of the July incident. The mother further argues that the court prevented her from fully presenting her claim of self-defense as to the July incident by denying her motion to continue the adjudication hearing and not allowing her lay opinion testimony as to J.C.'s physical strength.

¶ 61    We first review the trial court's finding that J.C. was neglected due to an injurious environment. "Only a single ground for neglect need be proven, thus when the [trial] court has found a minor neglected on several grounds we may affirm if any of the [trial] court's bases of neglect may be upheld." *In re Faith B.*, 216 Ill. 2d 1, 9 (2005).

¶ 62    The Act defines a "neglected minor" as one "whose environment is injurious to [their] welfare." 705 ILCS 405/2-3(1)(b) (West 2018). "Generally, 'neglect' is defined as the failure to exercise the care that circumstances justly demand and includes both willful and unintentional disregard of parental duties." *In re Christopher S.*, 364 Ill. App. 3d 76, 88 (2006). "The term 'injurious environment' is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for her children." *In re M.D.*, 2021 IL App (1st) 210595, ¶ 24.

¶ 63    Here, the trial court's finding that J.C. was neglected due to an injurious environment was

not against the manifest weight of the evidence.

¶ 64     The mother left J.C. in Jamaica in the care of her older brother in 2007. J.C., at the age of 6 or 7 years, was sexually abused for six months. There is no evidence that J.C. received assistance or treatment as a result of the abuse other than one visit to an emergency department. Although the mother brought J.C. to live with her and the stepfather in 2013, they were not happy with J.C. in their home. There were constant arguments and physical altercations. The mother threatened to take J.C. back to Jamaica and told hospital staff and police that J.C. ruined everything. The mother informed Mercy Home staff that she did not feel it was safe for J.C. to be with the stepfather alone and that he did not want J.C. in his home. The mother did not provide a safe and nurturing home or environment for J.C.

¶ 65     Additionally, J.C.'s needs were not met while in the mother's care. The mother testified that J.C. exhibited behavioral issues beginning in 2013, but we are without evidence that J.C.'s issues were addressed until her multiple hospitalizations in 2016. These hospitalizations occurred after an escalated event, an altercation involving the mother and often the stepfather, or suicidal ideations. During her hospital stays, J.C. was diagnosed with several mental health issues, including PTSD, bipolar affective disorder, DMDD, and major depressive disorder and was prescribed medications. The hospital records showed that J.C. lacked primary family support and concern from the mother and had parent-child conflicts. Upon her several discharges from the hospitals, it was recommended that J.C. continue with various therapies, including individual and family therapies, and medication monitoring. Although hospital personnel instructed the mother on the importance of following these recommendations, the mother did not do so. In her testimony, the mother showed confusion as to J.C.'s many diagnoses and medications. There are no records showing that J.C. received any further treatment after May 2017.

¶ 66    The unresolved turmoil in the mother-child relationship and the mother's inability to deescalate a situation with J.C. led to the July incident and physical injuries to J.C., including a head laceration requiring medical intervention. Jackson testified that J.C. told her that the mother hit her with a wooden object. While the mother testified that she acted in self-defense during the July incident and J.C. cut her head when she slipped and hit a windowsill, the fact remains that J.C. was injured while in the mother's care and during a physical quarrel between the mother and J.C. Again, this evidence supports a finding that the mother did not provide for J.C.'s welfare and that J.C. was neglected due to an injurious environment. See *In re F.S.*, 347 Ill. App. 3d 55, 66-68 (2004) (non-accidental injuries supported finding of neglect due to an injurious environment).

¶ 67    However, the mother argues that the trial court erred in finding that Jackson was credible, and she was not credible in their testimonies as to the July incident.

¶ 68    On review, we will not disturb the trial court's findings of credibility unless the opposite conclusion is clearly evident, and we will not substitute our judgment for that of the trial court in regard to the credibility of the witnesses. *In re D.F.*, 201 Ill. 2d 476, 499 (2002).We find that based on the inconsistencies in the mother's various statements as to the July incident and in her testimony as to J.C.'s mental health diagnoses and medications, it was reasonable for the trial court to find the mother lacked credibility.

¶ 69    Additionally, the mother's actual argument is not that Jackson lacked credibility when testifying as to J.C.'s statements but that the trial court should not have taken J.C.'s statements to Jackson as true. The Act creates an exception to the general rule against hearsay and allows for the admission of evidence as to J.C.'s out of court statements relating to the allegations of abuse and neglect. *In re An. W.*, 2014 IL App (3d) 130526, ¶ 61. However, the statements must be corroborated by other evidence. 705 ILCS 405/2-18(4)(c). Here, the Comer medical records

corroborated J.C.'s statements that the mother struck her during the July incident. Those records demonstrate that J.C. suffered injuries which were consistent with being struck: a two-centimeter laceration on her scalp and bruising on her right forearm and legs. J.C.'s statements about the July incident to police which were recorded on the body camera videos were also consistent with her statements to Jackson. Thus, the trial court's determination that Jackson was credible was not an abuse of discretion and it did not err in considering Jackson's testimony as to J.C.'s statements.

¶ 70    The mother contends that a finding of no-fault dependency was more appropriate than a finding a neglect where J.C. was uncooperative and ran away and the mother sought assistance from the police. We disagree.

¶ 71    No-fault dependency can be found only where there is no fault, no neglect, and no lack of concern by the parents. *In re L.H.*, 384 Ill. App. 3d 836, 842-43 (2008). The parents must make continual good-faith efforts to meet the minor's needs. *In re Z.L.*, 379 Ill. App. 3d 353, 381 (2008). Further, a finding of dependency is not appropriate where the parents made little to no effort to find alternative care and showed no interest in participating in services and where the minor did not present any real physical danger. *In re Rayshawn H.*, 2014 IL App (1st) 132178, ¶¶ 28-30.

¶ 72    The evidence does not support the mother's arguments as to no-fault dependency. First, J.C. denied that she ran away but rather was forced to leave the home. There is evidence to support her claims in that the mother and the stepfather often declared they did not want J.C. living with them. Further, as discussed, there is no medical evidence of treatment for J.C. before 2016 or after 2017. J.C. was hospitalized time after time in 2016, but J.C. did not receive the necessary aftercare and medication monitoring. The mother showed disinterest in engaging in family therapy and taking the required steps to assure that J.C.'s needs were met. Finally, the evidence reveals the mother waited for situations in the home to escalate before calling the police or hospitalizing J.C.

Overall, the mother did not exhibit a commitment to provide the necessary care for J.C. but rather a desire that J.C. leave the home and return to Jamaica. We agree with the trial court that the evidence supports a finding of neglect rather than no-fault dependency.

¶ 73 We conclude that the trial court's finding of neglect was not against the manifest weight of the evidence. Because we uphold the trial court's finding of neglect, we need not review the additional findings that J.C. was abused and the mother was the perpetrator. *Faith B.*, 216 Ill. 2d at 9 (where our supreme court upheld a finding of neglect and found review of the finding of abuse was not necessary) (citing 705 ILCS 405/2-3(2)(i)) (West 2000)). And because we do not review the findings of abuse, we need not consider the mother's arguments that the trial court erred in denying a continuance to investigate the May incident and excluding her lay opinion as to J.C.'s physical strength as those issues relate to the mother's claim that she acted in self-defense when J.C. was injured during the July incident.

¶ 74 For the foregoing reasons, we affirm the trial court's judgment.

¶ 75 Affirmed.